## Case No. 14,370.

### UNION MILL & MIN. CO. v. DANGBERG et al.

[2 Sawy. 450.] [1]

Circuit Court, D. Nevada. Aug. 7, 1873.

**WATERS—IRRIGATION—RIGHTS OF SERVIENT TENEMENT—AQUIESCENCE—PUBLIC LANDS—PATENT—HOMESTEAD—ENTRY—REASONABLE USE.**

1. No presumption of a grant arises from an adverse use of water, unless the use has been peaceable, and to be peaceable it must have been with the acquiescence of the owner of the servient tenement.

2. If, during the time of alleged use, the plaintiff, the owner of the servient tenement, denied the right of the defendant, the owner of the dominant tenement, to use the water for irrigation to its injury, and remonstrated against such use, this is enough to show that the use was not acquiesced in, and to prevent the presumption of a grant of the right to so use the water from arising

3. There may be an invasion of the right which will justify an action, although actual damage is not shown. But a distinction must be taken between those uses of water which are the exercise of the riparian proprietors' natural right and those which are not: in the former case actual damage must be shown, but need not be in the latter.

4. One who has entered and paid for land and received a certificate of purchase, has the equitable title, and is entitled to riparian rights, although he has not received his patent.

[Cited in Hayner v. Stanly, 13 Fed. 226; Pacific Coast M. & M. Co. v. Spargo, 16 Fed.

350; Hamilton v. Southern Nevada Gold & Silver Min. Co., 33 Fed. 566.]

5. One who has entered land under the homestead act, and continues to reside thereon, is entitled to use water as other riparian proprietors may.

6. A person who entered and paid for his land before the passage of that act, holds the land unaffected by it, since his patent when issued will relate to the date of his entry, the inception of his title.

[Cited in Aurora Hill Consol. Min. Co. v. Eighty-Five Min. Co., 34 Fed. 518.]
[Cited in Lux v. Haggin, 69 Cal. 255, 10 Pac. 674.]

7. The true test as to a reasonable use is whether the use works actual, material and substantial damage to the common right; not to an exclusive right to all the water in its natural state, but to the right which each proprietor has as limited and qualified by the precisely equal right of every other riparian proprietor.

[Cited in Jones v. Adams (Nev.) 6 Pac. 445.]

8. In the exercise of his common right every proprietor may consume so much water as is necessary for his household and domestic purposes and for watering his stock.

Injunction bill. The facts appear in the opinion, and in the case of the same plaintiff against Ferris [Case No. 14,371].

Sunderland & Wood and Williams & Bixler, for plaintiff.

Clarke & Lyon, R. S. Mesick, and Clayton & Davies, for defendants.

Before SAWYER, Circuit Judge, and HILLYER, District Judge.

HILLYER, District Judge. Eleven suits were commenced by the plaintiff in the year 1871, against various persons, to restrain them from an alleged wrongful diversion of the waters of Carson river. At the March term of 1872, the case of one defendant, Albert Ferris, was argued and submitted. Several points decided in that case arise in them all, and as our opinion remains unchanged in respect to them, they will not be discussed again now. [Case No. 14,371.] After that decision was announced, decrees were entered in six of the eleven cases, upon stipulation of counsel. The remaining five cases have now been submitted, and such points as were not determined in the case of Ferris will be briefly noticed, with the principles which have controlled the court in the rendition of final decrees.

In the first place the defendants, H. F. Dangberg, H. A. Dangberg, A. Klauber, F. A. Frevert, Jones, Squires and Winkleman, claim that they have a good defense through an adverse use and enjoyment of the waters for the required length of time.

The qualities which an adverse use must have to support a claim of title thereby, are well settled. The user must be neither secret nor forcible, nor by request, but open, peaceable, and as of right.

The user, to be peaceable, must be with the acquiescence of the owner of the servient tenement. A user which such owner opposes by word or deed becomes forcible, and

1 [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

thus lacks an essential element, without which the use gives no title, and raises no presumption of a grant. If, says Mr. Washburne, it should appear that during the period of the alleged acquisition of an easement by use and enjoyment, the owner of the servient tenement resisted such claim or opposed such use, it would negative the claim. Washb. Easem. 154. In Powell v. Bagg, 8 Gray, 441, it was said that the title to an easement rests chiefly on an acquiescence in an adverse use, and evidence which disproves the acquiescence rebuts the title to the easement. By the civil law, any enjoyment or user was deemed forcible to which opposition was offered, either by word or deed, by the owner of the servient tenement, and a thing was never presumed to be burdened with a servitude where a doubt existed. Ang. Water Courses, § 210; Kaufman, Mackeld. Civ. Law, 323. When the owner of the servient tenement frequently remonstrated against the diversion of the water, it was held that there could be no presumption of a grant. Stillman v. White Rock Co. [Case No. 13,-446].

The evidence in these cases proves that the plaintiff did not, during the five years of alleged adverse use, acquiesce in any use of the water by the defendants beyond that which they might lawfully make of it as riparian proprietors.

It appears that during that period the plaintiff and its predecessors, owners of the Merrimac Mill, have asserted their right to all the water which their mill-race would carry, that they have denied the right of the defendants to obstruct or divert the water to their injury, and have repeatedly remonstrated with them against their excessive use of the water in irrigation.

During the irrigating seasons of the years 1865, '66, '67, '68 and '69, the owners of the Merrimac Mill, together with other mill-owners on the river, caused a notice to be printed and distributed and posted through the Carson valley, in the vicinity of these defendants, notifying ranchmen and others "that any diversion of or obstruction to the flow of the water of the Carson river, to the injury of any of the mills thereon, will be resisted by all means which the law affords. The rights of said mills to the full flow of the water of said river, as already established by the courts, will be insisted upon and enforced." Men were employed to go through the valley, visit each farmer, distribute these notices, and remonstrate with the farmers against their excessive consumption of the water for the purpose of irrigation. Here we have a denial of the right to use whenever the use was injurious to the plaintiff, and it is impossible to hold that the user was uninterrupted and peaceful, or to presume a grant.

The statute of limitations of this state bars an action to recover real property unless the plaintiff was seized or possessed of the property within five years before its commencement. In analogy to this statute, the length of time necessary to confer title to an easement by adverse use, is fixed at five years by the courts. This is the only operation the statute has in these cases. To ascertain the requisites of an adverse use we still look to the common law, except as to the length of time it must continue, and that we fix in analogy to the local statute. If there has been an adverse use, in the legal sense, for five years, that gives title, and no grant need be produced to establish it; a grant will be presumed. Presuming a grant is in most cases a fiction of law, the court rarely believes the grant ever had an existence. The presumption then is not made because the evidence justifies the court in believing that a grant was once in fact made, but because it shows an adverse enjoyment for the required length of time, and possessing all the other requisite qualities. Therefore evidence which shows that the use of the defendants lacks the essential and indispensable requisite of acquiescence on the part of the plaintiff, prevents the presumption from arising.

That there may be, as argued by defendants, an invasion of the plaintiffs' right which will justify an action without showing actual damage, is not questioned. But in applying this doctrine a distinction must be taken between those uses of the water which are the exercise of the riparian proprietor's natural right and those which are not. Such proprietor has a right to use the water for the purpose of irrigation as incident to his ownership of the land; the right is not acquired by use. The only limitation is, that he must so use the water as to cause no actual material damage to another; and, of course, no cause of action against him arises until such damage has resulted. On the other hand, one proprietor has no right to divert, in the technical sense, any portion of the water permanently from another, so that it either does not return to the stream at all, or not until it has passed the land of him below. Such diversion would be a clear violation of right, and, if continued adversely for the requisite period, would ripen into title. An action, therefore, would lie for an injury to the right without proving actual damage, or showing that the plaintiff was making any practical use of the water. This distinction is important, and will reconcile much that seems conflicting in the books. If the plaintiff had no mill, and was making no practical use of the water, it would seem hardly possible to show that the defendants caused it any material or actual damage by their use of the water for the lawful purpose of irrigation. In this practical age it would be unworthy of a court of justice to notice the fanciful injury resulting from depriving the eye of the gratification of seeing or the ear of hearing the full flow of the water. Those may be injuries in a certain sense, but they are of the kind to which the maxim "De minimis non

curat lex" applies, as it does to the planting of a tree, which, in some degree, obstructs my neighbor's light, or kindling a fire in my chimney which tends to lessen the purity of his air. So long as the plaintiff has enough for its lawful, practical uses, it ought not and cannot be permitted to debar other riparian proprietors from applying so much water as they profitably can to agricultural purposes. It follows that the plaintiff lost no right, and the defendants gained none, by defendants using the water for irrigation. The plaintiff might safely concede the right to use the water for that purpose while it suffered no actual damage.

We have seen that whenever it was damaged, it objected, and denied the right of defendants to use the water to its injury. This is enough to defeat the title alleged to have been acquired by adverse enjoyment.

A point made by the plaintiff is, that some of the defendants, who have entered and paid for their land, and received a certificate of purchase, but no patent as yet, have no title, by virtue of which they can claim and exercise riparian rights. It is true that such defendants have not the strict legal title; but it is settled that the entry and payment and certificate thereof convey the equitable title. Thereafter the land ceases to be public, and the government has no right to sell it again, but holds the legal title in trust for the purchaser. The land is no longer the property of the United States, and may be taxed by the state without violating the compact not to tax United States property. People v. Shearer, 30 Cal. 648; Carroll v. Safford, 3 How. [44 U. S.] 441; Witherspoon v. Duncan, 4 Wall. [71 U. S.] 210; Hughes v. U. S., Id. 232. They have also the actual possession as well as the beneficial estate or interest in the land, and as such possessors and equitable owners are entitled to enjoy all the incidents to the land and its ownership, as well as the land itself. The patent when issued relates back to the original entry, the inception of title, so far as is necessary to protect the purchaser's right to the land. Id., and Gibson v. Chateau, 13 Wall. [80 U. S.] 92. Upon these authorities it is evident that the plaintiff's objection is groundless. The defendants are, to all intents and purposes, the owners of the land, and entitled to riparian rights. So, too, we consider that the defendant who has entered land under the homestead act, and continues to reside thereon, being rightfully in possession in pursuance of a law of the United States, is entitled to use the water of the stream as other riparian proprietors may.

We must also hold, since the patent when issued will relate back to the inception of title, that is, the original entry and payment, that one who entered and paid for his land prior to the passage of the act of congress of July 26, 1866, entitled "An act granting the right of way to ditch and canal owners over the public lands, and for other purposes," has his land and the water upon it unaffected by that act.

We come next to the inquiry whether or not certain channels, creeks and sloughs, as they are called, are natural water-courses. Without reviewing the evidence here, it is sufficient to state that we find "Brockliss slough," "Cottonwood slough," "Rock Creek slough," the "Old channel," and "Dangberg creek," to be natural water-courses, and that the defendants, through whose lands they pass, have a right to use the water naturally flowing in them in a reasonable manner for irrigation and other lawful purposes.

Referring to "Dangberg creek" and the "Old channel," it appears that in former years so much water naturally flowed from the east fork into them as to flood and injure the farms. To remedy this, obstructions were placed in these channels, at their heads, and the water led into them from other points, in the one case a little above, and the other a little below the old head. This slight change in the channels enables the defendants to control the flow of the water, and prevent injury to their farms, while it in no way damages the plaintiff. We do not regard these channels as any less natural water-courses since this change than they were before.

The next step is to determine what is the test of a reasonable use. To state the question in another way: the defendants having a right to make a reasonable use of the water for irrigation, when does their use become unreasonable? Mr. Justice Story has stated the rule as clearly as it can be stated, probably, in the following extract from his opinion in Tyler v. Wilkinson [Case No. 14,312]: "There may be, and there must be, allowed of that which is common to all a reasonable use. The true test of the principle and the extent of the use is, whether it is to the injury of the other proprietors or not. There may be a diminution in quantity, or a retardation or acceleration of the natural current indispensable for the general and valuable use of the water, perfectly consistent with the existence of the common right. The diminution, retardation, or acceleration not positively and sensibly injurious by diminishing the value of the common right, is an implied element in the right of using the stream at all. The law here, as in many other cases, acts with a reasonable reference to public convenience and general good, and it is not betrayed into a narrow strictness subversive of common sense, nor into an extravagant looseness, which would destroy private rights. The maxim is applied, 'Sic utere tuo ut non alienum lædas.'" Chancellor Kent states the principle with equal clearness as follows: "All that the law requires of the party by or over whose land the stream passes is, that he should use the water in a reasonable manner, and so as not to destroy, or render useless, or materially diminish or affect the application of the water by the proprietors above or below on the stream." This is the law and

the test by which the question of reasonable use or not is to be tried. As a definition of this "common right" spoken of by Judge Story, the language of Mr. Baron Parke, in Embrey v. Owen, 6 Exch. 353, may be profitably quoted. He says: "This right to the benefit and advantage of the water flowing past his land is not an absolute and exclusive right to the flow of all the water in its natural state; but it is a right only to the flow of the water and the enjoyment of it, subject to the similar rights of all the proprietors of the banks on each side, to the reasonable use of the same gift of Providence." To the same effect is the language of Mr. Justice Nelson, in Howard v. Ingersol, 13 How. [54 U. S.] 426. "No proprietor." he says, "has a right to use the water to the prejudice of other proprietors, above or below, unless he has acquired a prior right to divert it. He has no property in the water itself, but a simple usufruct while it passes along. Any one may reasonably use it who has a right of access to it; but no one can set up a claim to an exclusive flow of all the water in its natural state; and that what he may not wish to use shall flow on till lost in the ocean."

From these authorities it appears that the use which is unreasonable, is such as works actual, material and substantial damage to the common right; no to an exclusive right to all the water in its natural state, but to the right which each proprietor has as limited and qualified by the precisely equal right of every other proprietor. The rule leaves the common right equal in times of plenty and of scarcity. Because the river is low and there is not sufficient water to drive plaintiff's mill, the proprietors above cannot be debarred from all use. They may still use the water, taking care to do no material injury to the common right of plaintiff, having regard to the then stage of the river. And at all times every proprietor may, in the exercise of this common right, consume so much water as is necessary for his household and domestic purposes, and for watering his stock.

Applying the test to the facts now before us, we find that the defendants did, at the time stated in the bills, use the water unreasonably to the injury of the plaintiff. This much we think clear, and it would serve no good purpose to comment upon the many volumes of testimony. We find, also, that the defendants threaten, and will, unless restrained, continue to so use the water; indeed they insist now, and have throughout this litigation, on their right to use so much water as they need during the season of irrigation, without regard to the rights or wants of the plaintiff. This constitutes one of those continually-recurring grievances which only a court of equity can adequately redress.

When we come to consider the terms of the decree, we find it impossible, however desirable such certainty may be, to measure out to the defendants a specific quantity of water in cubic inches flowing under a given pressure as reasonable, or to designate a certain number of acres of land which a defendant may at all times reasonably irrigate, and restrict him to that quantity of water or number of acres. Counsel for the plaintiff, without admitting the correctness of any such standard for determining a reasonable use, was willing to take decrees permitting the defendants each to irrigate one hundred and sixty acres of land, but defendants not consenting to this it could not be done. The changes in the volume of the Carson river during the summer season, which naturally occur, are such that the quantity of water which a proprietor may reasonably consume varies continually. At times the melting snow gives an abundance for all, and the defendants can use it as they please, without any injury whatever to plaintiff. At other times a defendant might easily so apply the water in irrigating one hundred and sixty acres as to waste and diminish it to the injury of plaintiff. Sometimes, indeed, there is so little water flowing in the river, that if none were used by defendants, in consequence of the evaporation and absorption during the passage over the rocky and gravelly bed for fifteen or twenty miles intervening between the defendants' farms and the premises of plaintiff, enough would not reach the plaintiff's mill to be of any practical use. At such time there would seem to be no good reason for saying that the use of the water by defendants is injurious to the plaintiff. For these, among other reasons, we think no such arbitrary standard of reasonable use can be set up.

Our conclusions in the five cases now under consideration are as follows: That the plaintiff is seized and possessed of the lands described in its bill and the mill situated thereon, and as incident thereto, is entitled to the rights of a riparian proprietor in the water of Carson river, flowing through and over said lands; that the defendants, with the exception of Charles Brodt, Godfrey Brodt, John Howard, Warren H. Smith and E. Lytle, are seized and possessed of the lands described in their answers, through and over which the waters of the east or west fork, or some one or more of the natural streams before mentioned, flow in their natural channel, and as incident thereto, are entitled to the rights of riparian proprietors in the waters of the streams naturally flowing over their land, but are not entitled to any exclusive enjoyment of such waters, as against the plaintiff, by virtue of prior appropriation or adverse use; that between the first day of July, A. D. 1871, and the fourteenth day of August of the same year, the defendants, with the exception of E. Lytle, did use the waters of said streams unreasonably, to the injury of plaintiff; and that plaintiff is entitled to decrees against all of said defendants, excepting E. Lytle, perpetually restraining them from diverting the waters of Carson river upon their lands or

elsewhere, so as to prevent the same from flowing freely to the lands and mill of plaintiff, to the extent necessary for the lawful uses and purposes of plaintiff in carrying on upon its said premises the business of reducing metalliferous ores or other lawful business in which it may now or hereafter be engaged; the decrees to contain a proviso in favor of all the defendants, except those named above as not owning lands on the stream; that nothing therein contained shall be construed to prevent them from using the water of said streams, naturally flowing through their land, for the purpose of irrigating said land, or other lawful purposes of a riparian character to such an extent, and so far as such use shall not cause actual, material and substantial injury to the plaintiff in its use of the water, and shall not diminish or materially contribute to the diminution of the water of said streams, so that such diminution shall prejudice, or cause material injury to the plaintiff in its practical application of the water on its said premises; and a further proviso that said defendants may at all times take and use a sufficient quantity of the water for their domestic and culinary purposes, and for watering their cattle. The decrees will also enjoin the defendants to take the water from said streams and apply it to its various uses upon said lands without unnecessary waste, and in the most economical manner consistent with its beneficial use, and return the surplus to the stream whence it was taken in like economical manner, and without unnecessary waste.

The defendant, E. Lytle, answered, denying that he had ever diverted any water, or that he threatened to do so, and there is no proof against him. The decree must therefore be in his favor for costs.

Decrees are to be drawn up in accordance with the views herein expressed, with costs in favor of plaintiff against the other defendants, to be taxed by the clerk, and apportioned by one of the judges of this court, so that each defendant shall be liable for the amount apportioned to him, and no more.