### ANDERSON et al. v. BASSMAN et al.

(Circuit Court, N. D. California. August 12, 1905.)

#### No. 12,857.

1. COURTS—UNITED STATES COURTS—CASES ARISING UNDER UNITED STATES STATUTES—JURISDICTION TO DETERMINE.

One who has acquired a right to the use of water from a stream flowing through the public land for domestic or irrigation purposes, in accordance with the laws of the state, is protected therein by Rev. St. §§ 2339, 2340 [U. S. Comp. St. 1901, p. 1437], and the jurisdiction of a federal court to determine the conflicting rights of parties is not affected by the fact that their lands and their points of diversion of the water are in different states.

2. WATERS AND WATER COURSES—ADVERSE USE.

An adverse use of the waters of a stream to give a right to such use by prescription as against another user must have been to the detriment of the latter, and continued with his acquiescence during the full period of the statute of limitations under a claim of right. So long as there was such quantity of water in a stream that the use of a portion of it by defendants did not deprive plaintiffs of the quantity to which they were entitled, or so long as, when the quantity became insufficient, plaintiffs forcibly prevented its use by defendants, the statute did not run against an action by plaintiffs to establish a priority of right.

**3. SAME—USERS FROM STREAM IN DIFFERENT STATES—RIGHTS DETERMINED.**

In California the common-law rule of riparian rights, and not that of prior appropriation, governs the right to use water from a stream for purposes of irrigation, each riparian owner having the right to make a reasonable use of a reasonable quantity of water on his land. In Nevada the rule of priority of appropriation governs without reference to whether or not the lands are riparian. *Held*, that riparian owners of lands on a stream in California and appropriators of waters for irrigation purposes from the same stream lower down in Nevada were equally protected in the rights given them by the laws of the respective states, both subject to the limitation that a reasonable quantity of water only for the beneficial use to which it was devoted should be taken; that it should be economically distributed, and the surplus unused returned to the stream; that where the quantity of water in the stream was at times insufficient even for the users in California they would be restrained from diverting water from the stream during such part of the time as would give to the lower users in Nevada their just share.

In Equity. Suit to determine water rights.

Alfred Chartz, D. W. Virgin, and N. Soderberg, for complainants.

Richard S. Miner and James M. Allen, for defendants.

MORROW, Circuit Judge. This suit was commenced by the complainants, citizens of the state of Nevada, engaged in the business of farming and stock raising therein, to enjoin the diversion of the waters of the West Fork of the Carson River by the defendants, citizens of the state of California. The said West Fork of Carson River is an innavigable stream, taking its rise in the high Sierras, in Alpine county, Cal., and running northerly and easterly into Douglas county, Nev. The complainants claim rights to the waters, of which they are being deprived by the diversion of the waters from the stream by the defendants, who are above them as regards the flow of the water. The defendants deny a prior or superior right to the use of said waters by the complainants, and contend that complainants are estopped to complain of the diversion of the waters at the present time.

In support of their claims the complainants allege: That they and their grantors and predecessors in interest have owned, occupied, and used their said land for more than 20 years last past for the purposes of farming and stock raising; that the West Fork of the Carson River is a natural water course, which flows in natural channels, and has flowed, from time immemorial, over, through, and upon the land of each of the complainants; that they and each of them are riparians on said stream, and entitled to have the waters thereof flow in the natural channels through and upon their said lands, and to make a reasonable use thereof for the irrigation of said lands and the crops growing thereon, and to have and use the said water for stock, household, and domestic purposes. They further allege that the climate where said lands are situated is arid, and the natural rainfall insufficient to produce crops, and that it is necessary during portions of each year, namely, the months of March, April, May, June July, August, September, and October, to irrigate portions of said lands in order to make them productive; that there

is no source from which water can be procured for the purposes above mentioned other than the said West Fork of the Carson River; that said stream rises in the high mountains west and southwest of the lands of the complainants, receiving its principal supply from the snow which falls during the winter months; that it is a stream of variable volume and flow, sometimes supplying sufficient water for the rights, necessities, and appropriations of the complainants, and at other times not carrying a sufficient quantity to satisfy their reasonable uses and rights. It is alleged that the complainants, their grantors and predecessors, settled upon the lands described in the complaint prior to the year 1864, occupied and used the same for agricultural and grazing purposes, and ever since that time have so occupied and used the said lands; that as soon as was possible, under the laws governing such matters, the complainants and their grantors and predecessors in interest purchased said lands and acquired the title in fee simple thereto, and complainants now own said lands by fee-simple title; that prior to the year 1865, and before the defendants acquired any interest in or right to the water of said West Fork of the Carson River, or any portion thereof, the complainants, their grantors and predecessors in interest, claimed, appropriated, diverted, and used, for the purposes above mentioned, water from said stream aggregating 21,201 inches measured under a 4-inch pressure, and all the water naturally flowing in said stream during the ordinary stages of said river, and particularly during the months of March, April, May, June, July, August, September, and October of each year, which number of inches of water is necessary and required by the complainants for the proper irrigation of their lands and domestic and other necessary purposes; and that during the years 1898 and 1899, when great drought occurred, and consequent scarcity of water, the entire volume of water naturally flowing in said West Fork of Carson River was insufficient to satisfy the rights and necessities of the complainants. It is alleged that on the ———— day of March, 1898, and ever since that day, the defendants have wrongfully maintained dams across said West Fork of Carson River above the dams of the complainants, and since said time have maintained ditches leading from said stream, by means of which dams and ditches they have obstructed, diverted, and wasted the waters thereof, and prevented the same from flowing in the said stream to the lands of the complainants. Twenty-four particular dams are described as among those obstructing the waters, built of rock, logs, earth, brush, straw, and manure, fouling and vitiating the water, rendering the same unfit for domestic purposes or for watering stock, each such obstruction constituting a nuisance. Complainants allege that by reason of the wrongful and unlawful acts of the defendants, and by means of the said dams and ditches, and the diversion and waste of the waters thereby, the lands of the complainants have become dry, and the crops growing thereon have been destroyed. It is further alleged that the defendants, and each of them, have used and do use in the construction of their said dams manure and other foul matter, and that by the use of such manure and foul matter the defendants,

and each of them, has and now does foul and vitiate the water of said West Fork of the Carson River, thereby rendering the same unfit for use to water stock, and for the domestic and household purposes of the complainants, thereby injuring complainants and each of them; that defendants threaten to continue to so foul and vitiate the said waters; that the said dams, ditches, and other obstructions of the defendants so maintained have been and now are a nuisance. It is alleged that the defendants threaten to continue the maintenance of said dams and ditches and to divert and waste the said waters. The complainants therefore pray that such acts may be enjoined by this court; that the dams and ditches constructed by defendants be abated as a nuisance; and that complainants be decreed to be the owners of the land described, and riparians on said West Fork of the Carson River, and entitled to the use of the waters thereof in its natural channels upon their land and for household and domestic purposes.

The defendants deny generally the allegations of the complaint, and by way of affirmative defense allege in their answer: That for a great many years prior to January 1, 1898, they have severally owned and been in the possession of certain lands situated on the West Fork of the Carson River, aggregating 5,669.15 acres, which they have used for farming purposes and in pasturing stock thereon; that many of the several tracts of land of the defendants are contiguous to each other, constituting one tract of farming land, and that the defendants have a common interest in the use of the water from said stream, and are and have been the successive users of said water upon their land; that the water of said stream flows in one well-defined natural channel in its passage through the county of Alpine, state of California, and through the lands of certain of the defendants, and supplies said land with water for stock, domestic, irrigation, and mechanical purposes. Eight of the defendants are specified as alleged riparians on the said stream, entitled to have the waters thereof flow in its natural channel through and upon their said riparian lands, and to make a reasonable use thereof for irrigation, watering stock, and household purposes. It is alleged that for over 20 years preceding the commencement of this action a reasonable amount of water was continuously used by the defendants and their grantors and predecessors for the above-named purposes. It is further alleged that each and all of the defendants are appropriators of the waters of said stream, and many years before the commencement of this action located, claimed, and appropriated the said waters for use upon their respective tracts of land; that for more than five years immediately preceding the commencement of this action the defendants, their grantors and predecessors in interest, have openly, notoriously, peaceably, uninterruptedly, continuously, and under a claim of right, and adversely to the whole world, and in particular to any and all titles or rights of the complainants, and with the knowledge and acquiescence of said complainants and their predecessors, appropriated, taken possession of, and used for the purposes mentioned all of the waters of the said West Fork of the Carson River to the extent of 4,726 inches meas-

ured under a 4-inch pressure, and have diverted said amount of water to their lands through ditches constructed by them. It is alleged that the climate where these lands is situated is arid, and the rainfall insufficient to produce crops, and it is necessary during portions of each year, namely, from March to October, to irrigate said lands to make them productive; that there is no other source from which to procure water for all said purposes than said stream. It is further alleged that prior to the year 1860, and about the year 1853, before the complainants, or any of them, acquired any interest in or right to the waters of said stream, nearly all of the defendants, their grantors and predecessors, claimed, appropriated, diverted, and used about all the water naturally flowing in said stream during its ordinary stages, which is the said amount of 4,726 inches; that said amount is necessary for their use; and that the defendants are now the owners, by right of appropriation and use, of said amount of water, and they are diverting the same, and claim the right to continue to do so, some as riparian proprietors, and all by appropriation, user, and prescription. But they deny that any of the dams constructed by them contains manure or other matter which would foul or vitiate the waters of said stream.

In their amended answer the defendants allege that complainants' cause of action, if any there be, is barred by the provisions of sections 318, 319, 322, and 323 of the Code of Civil Procedure of California, and by sections 3707 to 3711, inclusive, of the Compiled Laws of Nevada, respecting limitations of actions; and, further, that the complainants are by their acts, words, and conduct estopped in equity and in law from claiming any title, estate, or interest of, in, or to the said waters of the West Fork of the Carson River, or to the use thereof, prior or paramount to any estate, right, title, or interest of the defendants therein, by reason of the acquiescence of the complainants in the acts of defendants in diverting the said waters, and spending many thousands of dollars in improving their said lands, which were dependent upon the said waters for productiveness.

The purpose of the suit, as alleged in the bill of complaint, is to obtain a decree (1) determining that the complainants, and each of them, are the owners of the land described in the bill, and are riparians on the West Fork of the Carson River, and entitled to have and use, and to have flow to and upon and through their lands, the waters of said river in its natural channels, and are entitled as such riparians to have and use the waters of said river for the irrigation of their lands, and for watering stock pasturing thereon, and for household and domestic purposes; (2) determining the right of each complainant as against the defendants to a specific quantity of the waters of the West Fork of the Carson River; (3) abating as nuisances certain obstructing dams in said stream and ditches conveying water therefrom; (4) enjoining defendants from obstructing, diverting, using, or wasting said waters; and (5) adjudicating to be invalid the claims of the defendants in and to said waters as against the complainants.

It appears from the evidence that 31 of the complainants own 25

separate and distinct tracts of land bordering upon and lying contiguous to said water course in Douglas county, Nev.; that these several tracts of riparian lands contain in the aggregate 5,744 acres, and extend along the course of the river from the state line downstream a distance of about 9 miles; that 11 other complainants own eight separate and distinct tracts of land not immediately upon the water course, but contiguous to the riparian lands of their co-complainants; that these latter tracts of nonriparian lands are also located in Douglas county, Nev., and contain in the aggregate 2,487 acres. It further appears from the evidence that 8 of the defendants own 8 separate and distinct tracts of land bordering upon and lying contiguous to said water course, but above the complainants, on the river and in Alpine county, Cal.; that these several tracts of riparian lands contain in the aggregate 646 acres, and extend along the course of the river above the state line a distance of about 6 miles; that 15 other defendants own 14 separate and distinct tracts of land in Alpine county, Cal., not immediately contiguous to the riparian lands of their codefendants, but in a different watershed, whose waters drain to the southeast through Diamond, Dutch, and Long Valleys, in the direction of the East Fork of the Carson River; that both the East and the West Forks of the Carson River rise in the high Sierras, and, flowing northward, unite about 1½ miles below and north of the most northern and lowest of complainants' tracts of land; that Diamond Valley is separated from the West Fork of the Carson River by a ridge of bowlders, gravel, and loam, forming a watershed that diverts the waters of Diamond Valley toward Dutch and Long Valleys and the East Fork of the Carson River; that these latter tracts of nonriparian lands owned by the defendants in Diamond and Dutch Valleys contain in the aggregate 2,258 acres. It appears further that the lands of the complainants, both riparian and nonriparian, are irrigated during the dry seasons by water drawn from the West Fork of the Carson River by means of ditches; that these ditches number 28 below the state line; that the nonriparian lands of the defendants in Diamond and Dutch Valleys, as well as the riparian lands along the course of the West Fork, are irrigated during the dry season by water drawn from the West Fork by means of ditches; that these ditches number 27 above the state line. It appears from the evidence that the West Fork of the Carson River is a variable, innavigable stream, carrying much more water at certain seasons of the year than at others, and varying also in different years.

A. J. Chalmers, an engineer and surveyor of 30 years' experience, measured the stream on September 19, 1898, at a point above all the ditches except one small ditch having a capacity of 30 inches and a flow of 9 inches, and he found that 1,750 inches of water were running in the river at that point. L. H. Taylor, an engineer of large experience, holding the position of resident hydrographer of the United States Geological Survey, took measurements of the river in 1900 and 1901 at about the same point as Chalmers. His measurements of the flow, expressed in miners' inches, for mean measurements, were as follows: October, 1900, 2,200 inches; November,

1900, 2,400 inches; December, 1900, 2,650 inches; January, 1901, 2,550 inches; February, 1901, 5,500 inches; March, 1901, 8,500 inches; April, 1901, 11,700 inches; May, 1901, 23,600 inches; June, 1901, 14,450 inches; July, 1901, 6,800 inches; August, 1901, 3,850 inches; September, 1901, 2,150 inches; October, 1901, 2,450 inches. There are also in the record extracts from an official report of the Surveyor General of the state of Nevada, concerning the flow of water in this river during the months of April, May, June, July, and August, 1890, from which it appears that the lowest water during that period was in August, when there was a minimum of 4,500 inches, and that the highest water was in June, when there was a maximum of 64,201 inches.

It is objected by the defendants that the relief sought by the bill, in determining the rights of the complainants to a specific quantity of the waters of the West Fork of the Carson River, is beyond the jurisdiction of this court, in that it is asking the court to pass upon titles to real property in another state. This question was considered by Judge Knowles in the United States Circuit Court for the District of Montana in the case of Howell v. Johnson, 89 Fed. 556, and later in the case of Morris v. Bean (C. C.) 123 Fed. 618. In each of those cases the complainant was a citizen of Wyoming, and the defendants citizens of Montana. The complainant owned land in Wyoming, and for the purpose of irrigating the same appropriated certain waters of a creek which had its source in Montana, flowed for some distance within its boundaries, and then entered the state of Wyoming. The complainant's point of diversion and ditch conveying the waters were within the state of Wyoming. Defendants settled along the banks of the creek in Montana, above the land of the complainant, and subsequently to the appropriation by complainant diverted the waters of said creek to their own lands, preventing its flow to the lands of the complainant. In the suit brought by complainant in the United States Circuit Court to enjoin the defendants from so diverting the waters of said creek the question of the jurisdiction of the federal court was raised by the defendants. The court held that one who has acquired a right to the water of a stream flowing through the public lands by prior appropriation, in accordance with the laws of the state, is protected in such right by sections 2339 and 2340 of the Revised Statutes [page 1437, U. S. Comp. St. 1901], as against subsequent appropriators, though the latter withdraw the water within the limits of a different state. This holding was based upon the distinction between the control of a state over the waters of navigable and innavigable streams within its boundaries. The waters in question were a part of an innavigable stream, the title to which was never acquired by either state, but remained in the federal government. As stated by the court:

"The federal government is not restrained in the disposal of its lands by state laws or state lines. Its laws upon this subject apply to the lands in one state as well as another. It has made grants of land extending through several states. The state governments cannot restrict it in the primary disposal

of its lands. If it may sell and dispose of its land as it may deem proper, there is no reason why it may not sell as a part thereof an incident thereto, such as the use of water flowing over the same."

It was further urged that, as the complainant had obtained his rights from the state of Wyoming by appropriating the water in accordance with its laws, his rights depended upon such laws, and were governed thereby. But the court very clearly explained that the rights of the complainant did not rest upon the laws of Wyoming, but upon the laws of Congress; that the legislative enactment of Wyoming was only a condition which brought the law of Congress into force. The court concludes:

"The idea that there can arise any international water-right question in the case of the appropriation of the waters of an innavigable stream cannot be maintained. The right to such waters, after the national government has disposed of them, must always be a question pertaining to private persons."

The same question was before the Circuit Court of the United States for the District of Colorado in Hoge v. Eaton, 135 Fed. 411. The facts in that case are very similar to the facts in the present case. In the opinion of Judge Hallett this question of jurisdiction is considered. He says:

"The idea of an exclusive right in the people of a state to divert its running waters to the injury of riparian owners in another state must be equally untenable. Indeed, the doctrine of riparian ownership and use of running water is not subject to political boundaries. Between hostile states the doctrine may not be recognized, but any such repudiation would be simple vis major. Between states dwelling in peace and concord, as are the states of our Union, the equal right of the inhabitants of each state to the waters of intersecting streams must always be recognized. Water is essential to human life in the same degree as light and air, and no bounds can be set to its use for supplying the natural wants of men, other than the mighty barriers which the Creator has made on the face of the earth."

This court is in entire accord with the views of these two courts upon this question.

The right of all but 11 of the complainants to the diversion of the waters of the West Fork of the Carson River is based upon their ownership of the land contiguous to the river and the appropriation of the water for domestic and irrigation purposes. The right of the 11 other complainants to the water of the river used by them for like purposes is based upon the law of appropriation alone. The law of Nevada authorizing the acquisition of water rights by appropriation has been declared by the Supreme Court of that state in a number of decisions. It will only be necessary to refer to the following cases for the rule applicable to the present controversy:

In Vansickle v. Haines, 7 Nev. 249, the Supreme Court, in 1872, held that the common-law doctrine of riparian rights prevailed in that state. But in Jones v. Adams, 19 Nev. 78, 6 Pac. 442, 3 Am. St. Rep. 788, the same court, in 1885, expressly overruled Vansickle v. Haines, holding that the common-law doctrine of riparian rights was not suited to the local conditions, and therefore that it did not prevail in that state. In Reno Smelting, Mill & Reduction Works v. Stevenson, 20 Nev. 269, 21 Pac. 317, 4 L. R. A. 60, 19

Am. St. Rep. 364, decided in 1889, the court reaffirmed Jones v. Adams, holding that the doctrine of prior appropriation, and not the common-law doctrine of riparian rights, is in force in Nevada. In Bliss v. Grayson, 24 Nev. 422, 56 Pac. 231, decided in 1899, the court again held that the doctrine of appropriation was the law of Nevada. The court said:

"The conditions of this state, the demands and necessities of agriculture, mining, and milling, and the prosperity of its people, has entirely swept away this doctrine of riparian rights as unsuited; and this court, by a line of decisions based upon the requirements of the state, its industries and necessities. has adopted a rule suited to those conditions and necessities. It is now the settled doctrine of this state that a person can acquire the right to use the water flowing in a stream for the purpose of irrigation by appropriation, as against riparian proprietors or other persons; the priority of rights of various claimants to the use thereof to be determined by the priority of time in making the various appropriations."

As stated by Mr. Long in his work on Irrigation, the law of appropriation is this:

"Each appropriator is entitled to all the water not already appropriated by others, and subject to appropriation, which he has actually diverted from the stream and has applied or will apply to beneficial use within a reasonable time, and no more. The extent of his right is measured by the extent of his lawful appropriation." Section 54.

Under this law the complainants are entitled, by acts of appropriation and long-continued use, to the water actually diverted to their lands for the purposes of irrigation by the ditches owned and controlled by them. The lands of the defendants are all located in California, and their right to take water from the West Fork of the Carson River for the benefit of such lands is subject to the law of this state.

In Lux v. Haggin, 69 Cal. 255, 10 Pac. 674, decided in 1886, the Supreme Court entered into an elaborate discussion of the respective rights of riparian proprietors and appropriators of water to the waters of flowing streams. The conclusion reached was that the common-law rule of riparian rights, and not that of prior appropriation, was the law of California. It has also been established that the right of the riparian proprietor includes the use of water for irrigation purposes. In Hargrave v. Cook, 108 Cal. 72, 77, 41 Pac. 18, 19, 30 L. R. A. 390, the court defined this riparian right as follows:

·"The right of a riparian proprietor in or to the waters of a stream flowing through or along his land is not the right of ownership in or to those waters, but is a usufructuary right—a right, amongst others, to make a reasonable use of a reasonable quantity for irrigation, returning the surplus to the natural channel, that it may flow on in the accustomed mode to lands below. * * * His rights are not easements nor appurtenances to his holding. They are not the rights acquired by appropriation or by prescriptive use. They are attached to the soil, and pass with it."

The same definition is given in Gould v. Eaton, 117 Cal. 539, 542, 49 Pac. 577, 38 L. R. A. 181.

In Mining Co. v. Ferris, 2 Sawy. 176, Fed. Cas. No. 14,371, in the United States Circuit Court for the District of Nevada, the controversy related to an alleged wrongful diversion of the water of

Carson river in Nevada. The decision was rendered in 1872, after the decision of the state Supreme Court in Vansickle v. Haines, 7 Nev. 249, holding that the law of riparian rights prevailed in that state. The decision in the federal court followed the decision of the state Supreme Court as to the character of the water right in that state, and expressly declared that the riparian owner was entitled to the reasonable use of water for irrigation purposes. The court said:

"Irrigation must be held in this climate to be a proper mode of using water by a riparian proprietor, the lawful extent of the use depending upon the circumstances of each case. With reference to these circumstances, the use must be a reasonable use, and the right must be exercised so as to do the least possible injury to others. There must be no unreasonable distribution or consumption of water."

In Union Mill & Mining Co. v. Dangberg, 81 Fed. 73, also in the Circuit Court of the United States for the District of Nevada, the complainant was the owner or part owner of a number of quartz-mills situated along and upon the banks of the Carson river. These quartzmills were using the water of the river for mill purposes. The defendants were farmers living on lands near the river above the mills, who had appropriated and were using the water of the river for irrigating their land and other domestic purposes. The case involved various conflicting claims between the riparian owners under the early law of the state as declared by the Supreme Court in Vansickle v. Haines, supra, as against the appropriators of water under the later law as declared by the same court in Jones v. Adams, supra. Judge Hawley, who was a justice of the Supreme Court of the state, and wrote the latter decision, had become United States District Judge for the District of Nevada, and heard the case of the Union Mill & Mining Co. v. Dangberg in the United States Circuit Court. In his decision in the latter case he reviews the subject of water rights, and discusses their scope and purpose with great care and ability; and upon many questions in the present case his opinion will be accepted as authority of conclusive weight. In the course of this opinion Judge Hawley says:

"Under the law of riparian proprietorship, an upper riparian proprietor is entitled to make a reasonable use of a portion of the water of a river to irrigate his riparian land, but he does not have any right to take the water away from the river to irrigate other lands that are not riparian. Kin. Irr. § 284; Gould v. Stafford, 77 Cal. 66, 18 Pac. 879."

And further:

"The right to water acquired by prior appropriation is not dependent upon the place where the water is used. A party having obtained the prior right to the use of a given quantity of water is not restricted in such right to the use or place to which it was first applied. It is well settled that a person entitled to a given quantity of the water of a stream may take the same at any point on the stream, and may change the point of diversion at pleasure, and may also change the character of its use, if the rights of others be not affected thereby. Hobart v. Wicks, 15 Nev. 418; Kidd v. Laird, 15 Cal. 162, 180, 76 Am. Dec. 472; Davis v. Gale, 32 Cal. 26, 91 Am. Dec. 554; Junkans v. Bergin, 67 Cal. 267, 7 Pac. 684; Ramelli v. Irish, 96 Cal. 214, 31 Pac. 41; Coffin v. Ditch Co., 6 Colo. 444; Sieber v. Frink, 7 Colo. 148, 2 Pac. 901; Strick-

ler v. City of Colorado Springs, 16 Colo. 62, 68, 26 Pac. 313; Woolman v. Garringer, 1 Mont. 535; Kin. Irr. §§ 233, 248; Black's Pom. Water Rights, § 69; Gould, Waters, § 237."

It follows from these authorities and others that might be cited that whether the water is taken from the stream in California by the riparian owner for the purpose of irrigation, or is taken from the stream in Nevada by the appropriator for the same purpose, the right is equally sanctioned by law, and is subject to the same limitations; that is to say, the right to use the water from the stream for irrigation purposes in either state under either right must be a reasonable use, to be determined by the circumstances of each case, and with due regard to the rights of others having the same beneficial use in the water of the stream. To quote again from the opinion of Judge Hawley:

"The question must be determined in each case with reference to the size of the river, the velocity of the water, the character of the soil, the number of proprietors, the amount of water needed to irrigate the lands per acre, and a variety of other circumstances and conditions surrounding each particular case; the true test in all cases being whether the use is of such character as to materially affect the equally beneficial use of the water of the stream by the other proprietors."

The next question to be considered is that of priority of rights as between the parties to the action. Voluminous testimony has been introduced with regard to the settlement of this country along the West Fork of the Carson River, the manner of acquiring title to the land, and the initial and progressive steps taken in the appropriation and use of water for irrigation and other purposes. It appears that some of the lands along the banks of this stream were settled by emigrants and Mormons as early as 1852. The land was fertile, and farm produce could be raised in sufficient quantity during the season of moisture to supply the needs of the little community and the passing emigrants, without resort to artificial means of obtaining crops. The discovery of the Comstock lode in 1859 produced an immediate demand for a greater supply of hay and all farm produce, and efforts were at once made in the surrounding country to obtain a greater acreage under cultivation. The lands near the river were overflowed every spring, leaving them in suitable condition for cultivation during the summer; but water was required for the lands of higher elevation, and so cuts were made in the banks of the river, and dams built at appropriate locations, the water being gradually conducted through ditches to lands at greater distance, until after a few years all the sagebrush land of the valleys, which at one time had been considered valueless, was under irrigation, and returning valuable crops. The settlement on the lands along the lower portion of the stream, in Douglas county, Nev., preceded the settlement on the lands higher up, in Alpine county, Cal. There is therefore a presumption of prior right in the appropriation of water for such settlements in Nevada. But, in the view I take of this case, the question of priority in the rights acquired by the original settlements along the river is not of great importance. It sufficiently appears from the evidence that the complainants have acquired rights under the law to the water

running in their ditches; that their rights extend back to a very early day, and in some instances for more than 40 years. The defendants have also acquired rights in this stream which they have enjoyed for many years. Some of the defendants have connected themselves in interest with riparian possessions as old as some of the riparian and appropriation rights of the complainants. Others of the defendants have appropriated the water of the stream for the purpose of irrigating lands not riparian in character. These appropriations in California were, of course, without authority of law, except as they may have been confirmed by the act of Congress of July 26, 1866, c. 262 (14 Stat. 251). But we need not enter into the consideration of that question. It is enough that, as against the complainants' claims of priority in settlement and construction of ditches, there has been some appropriation of the water of the river by the defendants for a period of time greater than the statute of limitations. The evidence establishes the fact that some of these nonriparian ditches have been in existence for more than 40 years, but it does not appear that their diversion of the water of the river has always been injurious to the rights of the complainants during that period. The evidence is to the effect that whenever the running of the water in these ditches deprived the complainants of the water to their injury they proceeded to open up the dams in the river that diverted the water into the defendants' ditches, and to turn the water back into the river, where it flowed down the channel until it reached the complainants' ditches. It is therefore not a sufficient defense to show that these ditches were in existence and carrying some water for the period of the statute of limitations. To establish such a defense to this action, it must appear that the complainants have acquiesced in defendants' diversion of the water into their ditches to the damage of the complainants for the continuous period of the statute of limitations.

The defendants' use of the water of the river was not adverse until it became injurious to the complainants and amounted to an actionable invasion of their rights. Union Mill & Mining Co. v. Ferris, 2 Sawy. 187, Fed. Cas. No. 14,371. It was not until 1898 that defendants' adverse use of the water to the injury of the complainants was not resisted and interrupted by physical force. The complainants then determined to appeal to the courts for relief, and this action was commenced in 1899. The defense of the statute of limitations cannot, therefore, be sustained, and with it must fall the plea of an equitable estoppel and title by prescription, so far as these defenses relate to the use of the water of the river to the injury of the complainants. This same question was before Judge Hawley in the case of Union Mill & Mining Co. v. Dangberg, and this is what he had to say:

"An adverse use of water for the statutory period must be open, notorious, peaceable, continuous, and under claim or color of right; for, if any act is done by other parties claiming the water that operates as an interruption, however slight, it prevents the acquisition of any adverse right. Mining Co. v. Dangberg, 2 Sawy. 450, Fed. Cas. No. 14,370; the Mining Débris Case (C. C.) 9 Sawy. 441, 513, 18 Fed. 753; Winter v. Winter, 8 Nev. 129, 135; Huston v. Bybee, 17 Or. 140, 20 Pac. 51, 2 L. R. A. 568; San Jose v. Trimble, 41 Cal. 536,

542; Lovell v. Frost, 44 Cal. 471; Hayes v. Martin, 45 Cal. 559; Cave v. Crafts, 53 Cal. 135, 138; Ball v. Kehl, 95 Cal. 606, 30 Pac. 780. The burden of proving an adverse uninterrupted use of water, with the knowledge and acquiescence of the party having a prior right, is cast on the party claiming it. American Co. v. Bradford, 27 Cal. 360; Gould, Waters, § 341, and authorities there cited. Any person may obtain exclusive rights to water flowing in a stream or river by grant or prescription as against either riparian owners on the stream or the prior appropriation of the water by other parties. But the right acquired by prescription is only commensurate with the right enjoyed. The extent of the enjoyment measures the right. A mere scrambling possession of the water, or the obtaining of it by force or fraud, gives no prescriptive right; nor can this right be acquired if, during the time in which such right is claimed to have accrued, there has been an abundant supply of water in the stream or river for all other claimants. In order to enable respondents to maintain a prescriptive right to the flowing water in the Carson river as against complainant, there must have been an uninterrupted enjoyment by them, under claim of right, for the period of five years. There must have been an actual occupation by the diversion and use of the water, to the knowledge and acquiescence of the complainant, such as to occasion damage and give it a right of action. There must have been such a use of the water, and such damage, as would raise a presumption that complainant would not have submitted to it unless the respondents had acquired the right to so use it. Dick v. Bird, 14 Nev. 161; Dick v. Caldwell, Id. 167; Boynton v. Longley, 19 Nev. 69, 76, 6 Pac. 437, 3 Am. St. Rep. 781; Water Co. v. Crary, 25 Cal. 504, 85 Am. Dec. 145; Grigsby v. Waterworks Co., 40 Cal. 396, 406; Anaheim Water Co. v. Semi-Tropic Water Co., 64 Cal. 185, 30 Pac. 623; Water Co. v. Hancock, 85 Cal. 219, 24 Pac. 645; Ditch Co. v. Heilbron, 86 Cal. 1, 12, 26 Pac. 523; Black's Pom. Water Rights, § 132; Kin. Irr. §§ 293, 294, 297."

This view of the question of priority leaves open for consideration the question whether the defendants have diverted an excessive quantity of water through their ditches for the irrigation of their lands, and whether the ditches themselves have been so defective in construction and operation as to be wasteful in the use of water. No better discussion of this question can be found than that contained in the opinion of Judge Hawley in the case of Union Mill & Mining Co. v. Dangberg, supra, and what he says there is peculiarly applicable to the facts in the present case:

"The thought is here suggested from the reading of the testimony in the record upon these points, that if a system of economy in the use of the water had been adopted, and more care taken that no water should have been allowed to run to waste, the occasion for the present litigation would probably have never arisen. The time is near at hand when greater attention must be given to these matters, and greater care and caution be exercised, to prevent parties from loss and damage which are or may be occasioned to other parties having equal rights to the waters of the river. An excessive diversion of water for any purpose cannot be regarded as a diversion to a beneficial use. Water in this state is too scarce, needful, and precious for irrigation and other purposes to admit of waste. No person, whether an appropriator or riparian proprietor, should be allowed to 'be extravagantly prodigal in dealing with this peculiar bounty of nature.' Combs v. Ditch Co., 17 Colo. 146, 154, 28 Pac. 966, 968, 31 Am. St. Rep. 275. The maxim of the law which he is bound to respect while availing himself of his right is, 'Sic utere tuo ut alienum non lædas.' Tyler v. Wilkinson, 4 Mason, 397, Fed. Cas. No. 14,312; Ferrea v. Knipe, 28 Cal. 340, 344, 87 Am. Dec. 128; Gibson v. Puchta, 33 Cal. 310; Shotwell v. Dodge, 8 Wash. 337, 341, 36 Pac. 254. Every year the area of land for which water is needed is increasing, and the supply is constantly diminishing. The following quotation from Kinney on Irrigation (section 30) is directly applicable to the facts of this case: 'It has been the policy of legislatures and courts, as far as possible, to suppress all wastefulness or wasteful methods in the use of waters. In the early days a prior appropriation was esteemed to cover all

water in sight, whether it was needed or not. But the principle of beneficial use, as the population increased, soon put an end to that conception. More stringent regulations may still be made in places, which will benefit not only those who have at present water rights in a certain stream, but also those desiring to divert water from the same. There are many appropriators who still demand the amount of water claimed by them at first, although that amount is many times more than is actually needed by them for the purpose to which they apply it. Having no knowledge whatever of the proper use of water as an aid to agriculture when they first made the appropriation, and there being at that time an entire absence of any written authority on the subject from which they could learn, and water then being plentiful, it followed, as a matter of course, that settlers adopted very wasteful methods in the use of it. Many of them still keep up those methods, notwithstanding the fact, demonstrated by practical experience, that by so doing they are raising smaller and poorer crops than they could raise by using the water more sparingly. In many places it has been shown that from a given stream five or six times as much land could be irrigated as had been thought possible in early days. But, even with the present various enactments for the prevention of these wasteful methods, the natural flow of streams is becoming daily more and more inadequate to meet the demand; and finally it has become apparent that, if the progress of the irrigation development is not to be seriously checked, more stringent measures will have to be enacted, or other sources of supply must be sought.' See, also, sections 165, 166; Black's Pom. Water Rights, § 142; Peregoy v. McKissick, 79 Cal. 572, 21 Pac. 967; Barrows v. Fox, 98 Cal. 63, 32 Pac. 811."

The evidence concerning the capacity, flow of water, and the extravagant and wasteful character of the defendants' ditches is conflicting. The testimony of the complainants shows that a number of defendants' ditches are large in capacity, diverting much more water than is necessary to properly irrigate their lands; that these ditches are so constructed as to be extravagant and wasteful in the use of water, and that in some instances the ditches have been constructed on improper grades, and are run through sandy and other porous soils, where the loss of water by percolation and seepage is so great that they deliver to the land to be irrigated only about one-half to three-fourths of the water taken from the river, the remainder running to waste without benefit to any one. It appears without contradiction that the ditches used to irrigate defendants' nonriparian lands do not return the surplus water to the river. The evidence also shows that in some of the dams constructed in the river by the defendants to raise the water so as to turn it into the ditches manure has been used as a material, among others, for the constructing of the dams, and that this manure has fouled the water flowing down the river. The evidence on the part of the defendants is in conflict with this evidence, except that I have found no evidence that the surplus water of the nonriparian ditches is returned to the river from which it is taken. It would be impossible, in an opinion of any reasonable length, to review this conflicting testimony in detail, and it will not be attempted. There are, however, a few controlling facts satisfactorily established that, in my opinion, will enable the court to enter a decree based upon the real issues in the case, and to those I will briefly refer.

When the water in the river during the dry season has not been sufficient to irrigate the lands of both the complainants and the defendants, the latter have endeavored to appropriate it all by closing

up their dams and turning the water into their ditches. These acts of the defendants appear to have been resisted by the complainants from time to time until the year 1898. This resistance consisted in opening the dams by force and keeping the water in the river, the defendants submitting to such proceedings, or at least taking no action in opposition thereto. It was only when there was sufficient water in the river for all that complainants acquiesced in the use of the water by defendants as they saw fit, and it was then that the defendants turned the water upon nonriparian lands without protest. When such use of water injured the complainants, they took the steps indicated to remedy the injury, until the year 1898, when it appears that they determined to appeal to the courts for relief. In September of that year the water of the river was measured above all the ditches but one small one, in which only 9 inches of water was running, and the river was found to have 1,750 miner's inches. At that time there was water flowing in all but one or two of the defendants' ditches, and none in the complainants' ditches; in fact, the channel of the river below the state line was dry. In other words, in September, 1898, the defendants appropriated all the water in the river, and allowed none to flow down to the complainants, and the result was a serious injury to complainants' crops along the river.

The defendants have not established their right to all the water in the river, regardless of the rights of the complainants; but, on the contrary, I think the complainants have established their right to have the defendants restricted to a reasonable and economical use of the water, whether taken as riparian owners, or appropriators for nonriparian lands. The evidence as to the amount of water required by the defendants for irrigation purposes does not appear to be seriously conflicting. Taylor, an expert witness upon the subject of irrigation, and familiar with defendants' lands, was called by the complainants. He testified that with moderate economy in the application of the water a half an inch of water to an acre of land, measured at the land, and not at the point of diversion, would be sufficient to irrigate defendants' lands. Wrinkle, an expert witness on the same subject, and also familiar with defendants' lands, was called by the defendants. He testified that one inch of water to an acre of land was sufficient to irrigate defendants' lands. He also testified that this amount of water, if it did not sink into the ground, would cover an acre of ground 8 feet deep with water, and be the equivalent of 96 inches of rainfall. It is evident that if this witness, in estimating that an inch of water would be sufficient to irrigate defendants' lands, meant to be understood that such an amount was required for that purpose, he made an allowance for the loss by seepage and wastage that the evidence shows defendants' ditches sustain in carrying the water from the river to their lands. The evidence shows that the riparian defendants irrigate 646.02 acres of land, and for that purpose claim the right to use water from the West Fork of the Carson River to the amount of 1,965.35 inches, or a little over 3 inches to the acre; that the nonriparian defendants irrigate 2,257.99 acres; that

they have other sources of water than the West Fork of the Carson River, but from this latter stream they claim the right to use 2,579 inches of water, or 1.14 inches to the acre, exclusive of other sources. It needs no argument to show that this claim is excessive, and should not be allowed as against the rights of complainants situated lower down the river. The law would not justify a decree giving all the water of the West Fork of the Carson River to the complainants without any diminution on the part of the defendants above for irrigation and domestic purposes, nor will the law justify a decree giving to the defendants all the water of the stream·for like purposes to the exclusion of the complainants below. The right of each is to have a reasonable apportionment of the water of the stream during the season of the year when it is scarce. But to divide the water so as to allow a certain number of inches to the complainants and a certain number of inches to the defendants is plainly impracticable. The only method that appears to provide a just and equitable division is some fair and appropriate division in time by which the complainants and defendants shall have the use of the water alternately during the dry season. I shall therefore direct that a decree be entered restraining the defndants from diverting the waters of the West Fork of the Carson River in excess of five days in every ten days during the months of June, July, August, September, and October in each year, and that the defendants be restrained at all times from placing manure or other polluting substance in the dams. The decree will also restrict defendants, whether riparian or nonriparian owners, on and after June 1, 1906, from using water from the river where no provision is made for returning the suplus water to the river. The parties to the action to pay their own costs.