## UNITED STATES v. WALKER RIVER IRR. DIST. et al.

District Court, D. Nevada.
June 6, 1935.
No. C–125.

H. H. Atkinson, U. S. Atty., as successor to George Springmeyer, former U. S. Atty., both of Reno, Nev., and Ethelbert Ward and Cole L. Harwood, Sp. Assts. to Atty. Gen., for the United States.

William M. Kearney, of Reno, Nev., for a large number of the defendants, including Walker River Irr. Dist.

George L. Sanford, of Carson City, Nev., for a number of other defendants.

Green & Lunsford, of Reno, Nev., for a number of the defendants including Antelope Valley Mutual Water Co., the successor to Antelope Valley Land & Cattle Co. and Minnie M. Powell.

Thatcher & Woodburn and William Forman, all of Reno, Nev., for Sierra Pacific Power Co. and Bank of Nevada Savings & Trust Co.

W. H. Metson and E. B. Mering, both of San Francisco, Cal., for certain defendants.

W. W. Watson, of San Francisco, Cal., for Bertrand Salles.

**ST. SURE, District Judge.**

This is a suit in equity brought by the United States, as plaintiff, hereinafter referred to as the government, against 253 defendants, all appropriators and users of the waters of Walker river, East Walker river, West Walker river, and the tributaries thereof, in the irrigation of lands in the Walker river basin owned or possessed by defendants. The suit is brought on behalf of the government by direction and authority of the Attorney General, by request of the Secretary of the Interior, under the provisions of chapter 345, 42 U. S. Stat. 849 (28 USCA § 112). The government, in its "sovereign and proprietary" capacity, claiming to be "the owner of," "appropriator of and entitled to the use and benefit of a vested water right" in and to 150 cubic feet per second of time of the waters of said rivers and their tributaries, seeks to quiet title thereto, and asks that defendants be restrained from in any manner interfering with the natural flow of said quantity of water to and upon the Walker Indian Reservation in the state of Nevada.

The complaint was filed on July 3, 1924, and an amended bill was filed on March 19, 1926. The amended complaint alleges that the United States on November 29, 1859, being the owner of the lands now constituting Walker River Indian Reservation, reserved and set aside said lands for the use of the Pahute and other Indians for the purpose of affording them the opportunity to acquire the arts of husbandry and civilization; that said lands are arid and incapable of producing crops without artificial irrigation; that approximately 11,000 acres of said lands are susceptible to irrigation from Walker river and have no other source of water supply; that the government began the irrigation of said lands in the year 1859 and gradually increased the irrigated area thereof until approximately 2,000 acres are now being irrigated and producing crops of hay, grain, and vegetables; that about 520 Indians live upon said lands; that the President of the United States by order on March 23, 1874,

withdrew from sale the lands of said reservation; that the government has expended in constructing canals, ditches, and improvements and in reclaiming said lands $175,000 and is maintaining upon said reservation an extensive Indian agency and school for said Indians; that 150 cubic feet of water per second of time from said river are necessary for the irrigation of the irrigable lands of said reservation and without said water said lands will become of little or no value; that the government by the reservation of said lands reserved 150 cubic feet of water per second for the irrigation thereof; that the defendants are using the waters of said river and its tributaries and preventing them from flowing down to said reservation and threaten to use all of said waters upon their lands and threaten to prevent the government and said Indians from using any of the water upon said reservation, and, unless enjoined, will cause the government irreparable loss and damage; that the government recognizes as binding the water rights on said river and its tributaries in Nevada and California which were adjudicated in that suit in said court entitled Pacific Live Stock Co. v. T. B. Rickey et al., hereinafter referred to as decree No. 731, but only to the extent that in asserting its own claim, it will not disturb the relative rights, as among themselves, of the parties to that decree who are parties to this suit. The prayer is for injunctive relief and that the court adjudge the government to have a prior right to 150 cubic feet of water per second; that its right thereto be quieted and that the relative rights of the parties to this suit to the waters of Walker river be adjudicated; that a water master be appointed for the carrying out of the decree.

The defendants filed their several answers and counterclaims to said amended complaint denying the rights of the government to said water, admitting the order of the President withdrawing said lands from sale, admitting that the lands are arid, denying that they are wrongfully diverting said water, but admitting that they are diverting and using said water under said decree No. 731, and setting up their respective lands, claiming the water of Walker river for the irrigation thereof with dates of priority and use. The defendants further allege that their lands were acquired from the United States under the homestead and desert land laws; that the water claimed by the defendants is necessary for the irrigation of their lands; that they and their predecessors in interest have been using the water of said river for more than 50 years; that the government permitted them, without objection, to expend millions of dollars in the construction of irrigation works for the irrigation of their lands, in reclaiming their lands, and in constructing houses and other improvements, all with the knowledge, assistance, and acquiescence of the government, and they pray that the government take nothing by its said suit against the defendants, and that their claimed rights be decreed to them. The defendants admit the use by the government of water from the Walker river stream system upon some of the lands within the reservation, based upon use as shown in decree 731, as follows:

| Priority | Cubic Feet Per Second | Acres |
|---|---|---|
| 1868 | 4.70 | 385.95 |
| 1872 | 3.55 | 295.80 |
| 1875 | 6.15 | 512.80 |
| 1883 | 7.50 | 625.20 |
| 1886 | 1.03 | 85.80 |

The defendant Sierra Pacific Power Company claims for its lands situated in the state of California, riparian rights, alleging that its rights were not determined by decree No. 731.

Walker river is a nonnavigable, interstate stream. It consists of two main branches, East and West Walker, which are fed by many small streams rising high on the eastern slopes of the Sierra Nevada Mountains in Mono and Alpine counties, Cal. The West Walker in the course of its descent flows through Leavitt and Pickle Meadows, two high mountain valleys, thence through a canyon with practically no cultivated area, thence northerly and northeasterly through Antelope Valley into the state of Nevada, thence through Smith Valley to the head of Mason Valley where it joins the East Walker river. The principal streams forming the East Walker river combine in Bridgeport Meadows, which is a large area devoted to the raising of wild grasses and pasturage at an elevation of 7,000 feet above sea level. The East Walker river flows thence northerly and northeasterly through canyons and sparsely populated valleys to Mason Valley where it unites with the West Walker river and forms the main Walker river. This river flows northerly and northeasterly, descends through the latter valley to

near the town of Wabuska, where it turns abruptly to the southeast and flows through the Walker River Indian Reservation and thence into Walker Lake. The mountains at the source of these streams are sparsely forested and afford little protection for the snows, resulting in a rapid runoff of the water upon the advent of warm spring days. The distance from the source of the two main branches of Walker river to the reservation are great, resulting in large losses of the water through evaporation and seepage. From the source of the East Walker to its junction with the West Walker, the distance is approximately 70 miles. From the source of the West Walker to the junction is approximately 67 miles, and from the junction through Mason Valley and to the point of diversion on the reservation the distance is approximately 35 miles, and from the latter point to Walker Lake approximately 12 miles. The peak of the flow usually occurs in May or June and thereafter the water subsides rapidly so that in most years the flow by the middle of July is insufficient, without storage facilities, to meet the requirements of the lands along the river which have been brought under cultivation. Even under natural conditions, that is, in the absence of upstream diversions, the water would not in some years reach the lands of the Walker River Indian Reservation by the end of July by reason of seepage and high evaporation loss occurring with the streams in a depleted condition at their source. Estimates show that the loss in transit between the lower end of Mason Valley to the diversion point in the reservation, when the flow had diminished to 10 or 12 second feet, would be 100 per cent., that is, that the entire flow when reduced to that volume would be lost by evaporation and seepage before reaching the diversion point on the reservation. There is a considerable return flow into the river from the water diverted for the irrigation of Bridgeport, Antelope, Smith, and Mason Valleys, which in a measure augments the flow to the Indian Reservation.

Bridgeport, the county seat of Mono county, Cal., is situated on the East Walker in Bridgeport Meadows. It has a population of about 600. The principal town in the water shed of the main Walker river is Yerington, the county seat of Lyon county, Nev., having a population of approximately 800. On the tributaries and on the main river the aggregate population of the district which embraces the lands claiming rights to the use of the waters of Walker river, exclusive of Indians, is approximately 3,000. The region of the Walker river and its tributaries is arid and incapable of producing crops without artificial irrigation and that river and its tributaries are the only source of water supply for the irrigation of the lands of the parties to this suit. By reason of the low precipitation, averaging annually less than 10 inches of water, the lands would be dry and arid and of little value without irrigation. The estimated annual value of the crops of hay, grain, and vegetables produced upon the lands of the defendants in this suit, together with the value of the stock and fowl raised thereon, amounts to approximately $1,750,000, and the assessed valuation of the lands in the district, exclusive of the lands of the government, is approximately $4,000,000.

The irrigated areas, exclusive of the reservation lands, are approximately as follows: Bridgeport Meadows, 20,000 acres; narrow valleys on East Walker, 16,000 acres; Antelope Valley, 12,000 acres; Smith Valley, 15,000 acres; Mason Valley, 48,000 acres.

There are two reservoirs constructed by the defendant Walker River Irrigation District, for the purpose of conserving the surplus water of Walker river, namely, the Bridgeport Reservoir situated on the East Walker river just below the town of Bridgeport, having a present capacity of 42,000-acre feet, and Topaz Reservoir situated near the West Walker river just below Antelope Valley, having a present capacity of 50,000-acre feet. There are also some small reservoirs situated on the East and West forks of said river. Most of the defendants in this action have certain rights in one or both of said reservoirs.

On November 29, 1859, the Commissioner of Indian Affairs wrote to the Commissioner of the General Land Office, requesting him to direct the Surveyor General of Utah Territory, which then embraced the present state of Nevada, to respect the reservation of a tract of land in the northwestern portion of the valley of the Truckee river, including Pyramid Lake and a tract in the northeastern portion of the valley of the Walker river, including Walker Lake as indicated by the red coloring upon the map accompanying the letter, when the public surveys should be extended over that portion of the territory;

and requested that in the meantime the proper local land offices be instructed to respect these reservations upon the books of their offices when such offices shall have been established. The Commissioner of the General Land Office, under date of December 9, 1859, instructed the Surveyor General at Salt Lake City to reserve for Indian purposes the territory embraced within the reservations delineated upon the map referred to in the said letter of the Commissioner of Indian Affairs to the Commissioner of the General Land Office. The correspondence shows that it was the intention to provide homes on the Walker River Indian Reservation for the Pahute tribe of Indians in order that they might be protected and enabled to support themselves. The United States in 1859 took steps to prevent trespassing upon said reservation. Subsequently a survey of said reservation was made and on March 23, 1874, the President issued the following Executive Order:

"The President.

"Executive Mansion, March 23, 1874.

"It is hereby ordered that the tract of country known and occupied as the Walker Lake Indian Reservation in Nevada, as surveyed by Eugene Monroe, in January, 1865, and indicated by red lines, according to the courses and distances given in tabular form on accompanying diagrams, be withdrawn from sale or other disposition, and set apart for the Pah-Ute and other Indians residing thereon.

"U. S. Grant."

The Executive Order of the President became effective as of the date the lands were withdrawn by the Commissioner of Indian Affairs in his letter to the Commissioner of the General Land Office, November 29, 1859.

The issues raised by the pleadings were referred to a Special Master in Chancery "to take evidence and testimony herein and to report the same to the court with his recommendations for the advice of the court as to conclusions of fact and of law and as to the form and substance of the decree to be entered." Hearings were had and testimony taken, commencing on March 22, 1928, and continuing thereafter from time to time until December 30, 1932. During the hearing the government, in order to shorten the time of the trial of this suit, conceded to the defendants, and the government and the defendants, except the defendant Sierra Pacific Power Company stipulated, through their respective attorneys, that all defendants' rights should be measured and determined under the doctrine of appropriation and beneficial use and that the rights of all defendants who were parties to decree 731 should stand as fixed by said decree. The master rendered his report with proposed findings of fact and decree. Arguments of respective counsel on exceptions to the report and findings were heard by this court commencing May 22, 1933, and continuing five days. Certain matters were re-referred to the master for further hearing and report and he has since filed herein a supplemental report. At the close of the argument the court, accompanied by counsel in the case, made a tour of the Walker River basin viewing the valleys, meadows, the Walker Indian Reservation, the storage reservoirs, a site of a proposed reservoir, and points of diversion of waters for irrigation. The transcript of the argument and final hearing was received by this court on November 21, 1934.

The master found that there was no necessity for the cultivation of a larger area of land than 2,100 acres on the reservation, and that a "flow of water from said river of 26.25 second feet at the point or points of diversion during the irrigating season of one hundred eighty days is necessary for the proper irrigation of said two thousand one hundred acres."

As a conclusion of law the master recommended the following:

"The plaintiff, United States of America, is entitled to the continuous flow of 26.25 cubic feet of water per second to be diverted from Walker River upon or above Walker River Indian Reservation during the irrigation season of one hundred eighty days for the irrigation of two thousand one hundred acres of land of said Reservation and the flow of water reasonably necessary for domestic and stock watering purposes and for power purposes to the extent now used by it, during the non-irrigating season, with a priority of November 29, 1859, and the plaintiff is entitled to an injunction against the defendants enjoining them from preventing or interfering with the natural flow of the above described quantities of water in the natural channels of Walker River and its tributaries to and upon Walker River Indian Reservation."

The government excepts to said finding and proposed conclusion of the master, in

that he "recommends the granting of a water right for only 2100 acres of land, with a flow of 26.25 cubic feet per second, whereas, * * *" he "should have recommended the granting of a water right to the government for 10,000 acres of land, and the corresponding amount of water, to-wit, 150 cubic feet per second of the flow of the Walker River during the irrigation season from March 15th to September 15th in each year."

"The case," say counsel for the government, "comes down to the consideration of the proposition that may be put something like this: Shall the United States in the performance of one of the highest and most solemn obligations it has assumed in its governmental and sovereign capacity, namely, the care, education and protection of the Indians, be deprived of the means to carry out this policy; be deprived of the property it reserved and set aside for those specific purposes, and shall these helpless wards of the government be deprived of their homes allotted and set apart to them, because of the neglect of the government officials, or because Congress itself neglected to act?"

It is the contention of the government that the action of the Commissioner of Indian Affairs, in 1859, calling attention to the "propriety and necessity of reserving" from sale and settlement, for the use of the tribe of Pahute Indians, a tract of land "in the northeastern part of the valley of Walker's River, including Walker's Lake," followed by the President's Executive Order, in 1874, setting apart the Walker Lake Indian Reservation, reserved not only the land therein, but also reserved and appropriated from the waters of the Walker river 150 cubic feet of water per second of time.

Main reliance is placed by the government upon the ruling in the case of Winters v. United States, 207 U. S. 564, 28 S. Ct. 207, 52 L. Ed. 340, but the facts in that case are readily distinguishable from those in the case at bar. There the decision was based solely upon an agreement or treaty with the Indians, whereas here there was neither agreement nor treaty. Indeed, history shows that neither was possible at the time, as the Pahutes were at war with the whites for some time subsequent to 1859. It is necessary to mention only a few instances with dates. In Thompson & West's History of Nevada, page 149, is to be found a letter of Isaac Roop, Governor of Nevada

Territory, to General Clarke, Department of Pacific, predicting war with the Pahutes because of the murder of eight men by the Indians; at page 149 mention is made of the Ormsby massacre of May 12, 1860; at page 152, an account of the burning of Williams Station where five men were murdered; at page 165, during April and May, 1861, over 1,500 Indians assembled at the fisheries near the mouth of the Walker river, headed by Wa-he and plotted against the agent and against Fort Churchill, Wa-he fled to Oregon, returned in 1862, and was killed by two Pahute chiefs. The Legislature adopted a memorial to Congress relative to the depredations committed by Indians in the territory of Nevada, asking the appointment of a commission to consider reimbursement of the settlers of Nevada and California for their expenses in protecting the settlements. (Laws Nevada Territory 1862, p. 196.) The Legislature passed a joint resolution asking for a federal military force to protect the Overland Trail and mail route from Nevada to the Missouri river against hostile Indians; "the Indian massacres which occurred in the summer and fall of 1864 are now being reenacted." (Statutes Nevada 1864-65, p. 462.) The Legislature passed a Senate memorial and joint resolution addressed to Maj. General Halleck, Commanding Department of the Pacific, asking a suitable force of cavalry, etc., to repress the depredations of hostile Indians in Nevada, declaring there had been depredations "every year since the settlement of the Territory." (Laws 1866, p. 267.) "That in May and June, 1861, the Overland mail and immigrant routes were attacked by Indians and communications closed between the Atlantic states and Pacific Coast." (Report to U. S. Senate on Rebellion War Claims of Nevada.) "That on account of a general uprising among the Indians along the entire Overland routes and branch lines and especially that portion between Salt Lake City in the Territory of Utah and the Sierra Nevada mountains * * * the maintenance and protection of the Overland mail and emigrant route through those sections, was regarded by the government as a military necessity." (Statement by Hon. W. M. Stewart, U. S. Senator, Aug. 10, 1888. 50th Cong. 1st Sess., page 2.)

The evidence shows that within a few years after the creation of the reservation, the lands along Walker river were taken up by white settlers under the homestead

and pre-emption laws and the Desert Land Act (43 USCA § 321 et seq.), and the water of the river was gradually applied by them to a beneficial use until all of the water of the river had been fully appropriated; that the white settlers were more diligent in applying the water to their lands than was the government in applying the water to the lands in the reservation; that the United States has for the past sixty years, or more, encouraged the settlers above the reservation to take up the public lands along Walker river and has sold and patented those lands to them; that the officials of the government in charge of the disposal of those lands knew that the lands were arid and incapable of economic use by the purchasers and without value except by means of irrigation and that the Walker river was the only source of water for their irrigation; that no protest was ever made or objection raised by the government to the growing use of the waters of the river upon the lands of the upstream appropriators until the entire flow of the river had been applied to a beneficial use.

The records of the government show that since the creation of the reservation there never have been as many as a thousand Indians living on the reservation; there was a population of about 600 in 1866, about 800 in 1875, and the findings of the master, sustained by the evidence, show that there are now "upon said reservation approximately five hundred Indians. Ninety-six individual Indians are farming parts of one hundred forty allotments of twenty acres each and ninety-six allotments have homes on them. The Indians generally refuse to irrigate at night and there results a considerable loss of water by reason thereof. The number of Indians upon said reservation is not increasing and it has not been shown that there is the necessity or demand by the Indians for the cultivation of a larger area of land than two thousand one hundred acres."

The Sixty-Ninth Congress, First Session, passed an act (chapter 714, 44 U. S. Statutes at Large, pt. 2, p. 779) "for reconnaissance work in Schurz Canyon, on the Walker River, State of Nevada, to determine to what extent the water supply of the river can be augmented and conserved by the impounding of its said waters, and to determine if there is a feasible reservoir site, or sites, available for the storage of such waters and for securing information concerning the feasibility of the construction of the necessary dam, or dams, and appurtenant structures, and for the purpose of determining the amount necessary for the purchase and acquisition of necessary lands and rights of way in connection with the construction of said dam or dams and appurtenant structures, which are proposed in order to provide water for irrigation purposes. * * *"

Following such authorization, an investigation was had and report was made to the Department of the Interior. The report is a very comprehensive one, containing 121 closely printed pages, known as the Blomgren "report on water supply and storage investigations of Walker River Indian Reservation, Nevada," December 26, 1926; House Document 767. On page 23, under the caption, "Necessity for Storage," appears the following:

"The subject of storage or a more dependable irrigation water supply for the Walker River Reservation has been a serious consideration since the inception of the irrigation system, and every superintendent in charge of the reservation has strongly recommended the construction of a storage reservoir.

"The office is no doubt familiar with the past water supply difficulties, as correspondence on the subject in the local files is very voluminous and the inclusion of all this in the report would require considerable space."

Then follows brief extracts and excerpts copied from letters and reports summarizing early opinion upon the subject, supporting above statement.

Upon page 92 of the report is found the following illuminating statement of the supervising engineer relative to the water supply of the rivers:

"Taking the records available and interpreting them in the light of experience, it is my judgment that even though it were possible to restore natural conditions—that is, blot out all development on the river above the reservation—the uncontrolled stream flow would be adequate for the full-season irrigation of the total irrigable area (10,000 acres) of the reservation only one *season of every two.*" (Italics supplied.)

And the recommendations of the supervising engineer (page 96) are as follows:

"(1) That water rights be adjudicated at the earliest possible date.

"(2) That the entire river system be placed in charge of a water commissioner appointed by the Federal court, with instructions to require the installation of suitable weirs, head gates, and measuring devices by all diverters.

"(3)' That a storage reservoir be created for the Indian land of Walker River Indian Reservation by the construction of a dam at the Rio Vista site, and that the irrigation system be extended to cover the entire irrigable area of the reservation."

The litigation begun in 1924 has continued, but the dam and storage reservoir at Rio Vista have not been constructed. The government's water problem at the reservation might be solved by accepting and acting upon the recommendations of its engineers. The construction of the proposed dam and reservoir would undoubtedly greatly increase the present supply and probably insure water sufficient for all needs of the reservation throughout the year.

In 1859 Nevada was a part of Utah Territory, became the territory of Nevada in 1861 (12 Stat. 209), and was admitted to statehood in 1864 (13 Stat. 30). The common law of riparian rights was recognized as the law at that time. Vansickle v. Haines, 7 Nev. 249. Later the Supreme Court of Nevada adopted the rule of appropriation as applicable to the arid lands of the state. Jones v. Adams, 19 Nev. 78, 6 P. 442, 3 Am. St. Rep. 788; Reno Smelting, Milling & Reduction Works v. Stevenson, 20 Nev. 269, 21 P. 317, 4 L. R. A. 60, 19 Am. St. Rep. 364.

In the "stipulation as to the trial of the case" of Pacific Live Stock Co. v. Rickey et al., which resulted in decree 731, the government was given an "option" to become a party to the suit. The government was invited to "file its pleading in this suit, which pleading need not be in any particular form, but which shall set forth, specially and particularly, what rights the government claims in or to the waters of said Walker River, and the basis and origin of the rights so claimed, and the times at which they respectively accrued; and such pleading shall be deemed sufficient to entitle said government, in the most liberal manner possible, to the full and complete presentation of its cause of action or defense or equitable rights concerning the matters in controversy in this suit, or in anywise appertaining thereto, and to have the same adjudicated in and by the decree of the court in this suit." By this suit, the owners of lands in the Walker River basin and the appropriators of water from the Walker river and its tributaries for beneficial use upon said lands were desirous of settling for all time the respective rights of all parties concerned, and though requested to become a party, the government did not choose to do so.

The exhibits in the instant case, and the official letters and reports of the Indian Bureau show that the government relied upon the doctrine of appropriation as late as 1910, when the superintendent of the reservation, in behalf of the Indians, made application to appropriate public waters of the state of Nevada.

■ All of such actions and circumstances above related, when considered with the "silent acquiescence" of the government to the diversion of water by the white settlers, amount to an administrative construction of the local laws then in force and "should be respected, and not overruled except for cogent reasons." United States v. Finnell, 185 U. S. 236, 244, 22 S. Ct. 633, 636, 46 L. Ed. 890; United States v. Johnston, 124 U. S. 236, 253, 8 S. Ct. 446, 31 L. Ed. 389.

The decision of the United States Supreme Court in the case of California Oregon Power Co. v. Beaver Portland Cement Co. et al., 55 S. Ct. 725, 727, 79 L. Ed. 1356, decided April 29, 1935, is applicable to the facts in this case. The decision is most important as directly affecting owners of lands in the desert-land states, acquired under the homestead and pre-emption laws, the Desert Land Act, and other acts passed by the Congress, and the appropriators of waters for beneficial use upon said lands. Suit was brought by the owner of lands in Oregon whose predecessor in interest acquired them by patent from the United States under the Homestead Act of May 20, 1862 (12 Stat. 392). The primary question presented to the Supreme Court for decision was whether the homestead patent carried with it as part of the granted estate the common-law rights which attach to riparian ownership. Justice Sutherland delivered the opinion of the court, which says, in part:

"For many years prior to the passage of the Act of July 26, 1866, c. 262, § 9, 14 Stat. 251, 253 (30 USCA § 51 and note, 43 USCA § 661, par. 1, and note), the right to the use of waters for mining and other

beneficial purposes in California and the arid region generally was fixed and regulated by local rules and customs. The first appropriator of water for a beneficial use was uniformly recognized as having the better right to the extent of his actual use. The common law with respect to riparian rights was not considered applicable, or, if so, only to a limited degree. Water was carried by means of ditches and flumes great distances for consumption by those engaged in mining and agriculture. Jennison v. Kirk, 98 U. S. 453, 457, 458, 25 L. Ed. 240. The rule generally recognized throughout the states and territories of the arid region was that the acquisition of water by prior appropriation for a beneficial use was entitled to protection; and the rule applied whether the water was diverted for manufacturing, irrigation, or mining purposes. The rule was evidenced not alone by legislation and judicial decision, but by local and customary law and usage as well. Basey v. Gallagher, 20 Wall. 670, 683, 684, 22 L. Ed. 452; Atchison v. Peterson, 20 Wall. 507, 512, 513, 22 L. Ed. 414.

"This general policy was approved by the silent acquiescence of the federal government, until it received formal confirmation at the hands of Congress by the Act of 1866, supra. Atchison v. Peterson, supra. Section 9 of that act provides that:

" 'Whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right of way for the construction of ditches and canals for the purposes herein specified is acknowledged and confirmed. * * *'

"This provision was 'rather a voluntary recognition of a pre-existing right of possession, constituting a valid claim to its continued use, than the establishment of a new one.' Broder v. Natoma Water & Mining Co., 101 U. S. 274, 276, 25 L. Ed. 790; United States v. Rio Grande Dam & Irrig. Co., 174 U. S. 690, 704, 705, 19 S. Ct. 770, 43 L. Ed. 1136. And in order to make it clear that the grantees of the United States would take their lands charged with the existing servitude, the Act of July 9, 1870, c. 235, § 17, 16 Stat. 217, 218 (30 USCA § 52 and note, 43 USCA § 661, par. 2

and note) amending the Act of 1866, provided that:

' "* * * All patents granted, or preemption or homesteads allowed, shall be subject to any vested and accrued water rights, or rights to ditches and reservoirs used in connection with such water rights, as may have been acquired under or recognized by the ninth section of the act of which this act is amendatory (this section).'

"The effect of these acts is not limited to rights acquired before 1866. They reach into the future as well, and approve and confirm the policy of appropriation for a beneficial use, as recognized by local rules and customs, and the legislation and judicial decisions of the arid land states, as the test and measure of private rights in and to the nonnavigable waters on the public domain. Jones v. Adams, 19 Nev. 78, 86, 6 P. 442, 3 Am. St. Rep. 788; Jacob v. Lorenz, 98 Cal. 332, 335, 336, 33 P. 119.

"If the acts of 1866 and 1870 did not constitute an entire abandonment of the common-law rule of running waters in so far as the public lands and subsequent grantees thereof were concerned, they foreshadowed the more positive declarations of the Desert Land Act of 1877, which it is contended did bring about that result. That act allows the entry and reclamation of desert lands within the states of California, Oregon, and Nevada (to which Colorado was later added), and the then territories of Washington, Idaho, Montana, Utah, Wyoming, Arizona, New Mexico, and Dakota, with a proviso to the effect that the right to the use of waters by the claimant shall depend upon bona fide prior appropriation, not to exceed the amount of waters actually appropriated and necessarily used for the purpose of irrigation and reclamation. Then follows the clause of the proviso with which we are here concerned:

" '* * * All surplus water over and above such actual appropriation and use, together with the water of all lakes, rivers, and other sources of water supply upon the public lands and not navigable, shall remain and be held free for the appropriation and use of the public for irrigation, mining and manufacturing purposes subject to existing rights.' Act March 3, 1877, c. 107, § 1, 19 Stat. 377 (43 USCA § 321). * * *

"The fair construction of the provision now under review is that Congress intended to establish the rule that for the future the land should be patented separately; and

that all nonnavigable waters thereon should be reserved for the use of the public under the laws of the states and territories named. The words that the water of all sources of water supply upon the public lands and not navigable 'shall remain and be held free for the appropriation and use of the public' are not susceptible of any other construction. The only exception made is that in favor of existing rights; and the only rule spoken of is that of appropriation. It is hard to see how a more definite intention to sever the land and water could be evinced. The terms of the statute, thus construed, must be read into every patent thereafter issued, with the same force as though expressly incorporated therein, with the result that the grantee will take the legal title to the land conveyed, and such title, and only such title, to the flowing waters thereon as shall be fixed or acknowledged by the customs, laws, and judicial decisions of the state of their location. * * *

"Nothing we have said is meant to suggest that the act, as we construe it, has the effect of curtailing the power of the states affected to legislate in respect of waters and water rights as they deem wise in the public interest. What we hold is that following the act of 1877, if not before, all nonnavigable waters then a part of the public domain became publici juris, subject to the plenary control of the designated states, including those since created out of the territories named, with the right in each to determine for itself to what extent the rule of appropriation or the common-law rule in respect to riparian rights should obtain. For since 'Congress cannot enforce either rule upon any state,' Kansas v. Colorado, 206 U. S. 46, 94, 27 S. Ct. 655, 666, 51 L. Ed. 956, the full power of choice must remain with the state. The Desert Land Act does not bind or purport to bind the states to any policy. It simply recognizes and gives sanction, in so far as the United States and its future grantees are concerned, to the state and local doctrine of appropriation, and seeks to remove what otherwise might be an impediment to its full and successful operation. See Wyoming v. Colorado, 259 U. S. 419, 465, 42 S. Ct. 552, 66 L. Ed. 999."

See, also, United States v. Central Stockholders' Corporation of Vallejo et al. (C. C. A.) 52 F.(2d) 322.

Under the facts before this court and the rule announced by the United States Supreme Court in above-quoted case, neither the contentions of the government for a water right of 150 cubic feet per second, nor the proposed finding and conclusion of the master, awarding the government 26.25 cubic feet per second with a priority of 1859, can be sustained. The government owns the lands in the reservation with the usual Indian right of occupancy in the Pahutes. "As the owner of the public domain, the government possessed the power to dispose of land and water thereon together, or to dispose of them separately. Howell v. Johnson (C. C.) 89 F. 556, 558." Cited with approval in California Oregon Power Co. v. Beaver Portland Cement Co., supra. In the present instance the government has disposed of both land and water to white settlers on the upper reaches of the Walker river and its tributaries, above the reservation. Those who have acquired water by prior appropriation for beneficial use are entitled to protection. The government reserved no rights to water for use on the reservation and there are therefore no *existing* rights in its favor, under the exception in the Desert Land Act. The rights of the government, in its use of the waters of the Walker river and its tributaries for purposes of irrigation, like the rights of all other diverters in the Walker River basin, are to be adjudged, measured, and administered in accordance with the laws of appropriation as established by the state of Nevada.

The Sierra Pacific Power Company, hereinafter called the Sierra Company, claims ownership to 2,482 acres of land situate in Mono county, Cal., riparian to the West Walker river. In its answer and counterclaim the Sierra Company alleges that by virtue of its riparian rights it "is entitled to have all the waters of said river flowing by, over, through and upon its said lands, and is entitled to take, divert and use said water for the irrigation of its arid lands for the watering of livestock thereon, for domestic purposes, and for all such purposes and uses as a riparian owner is entitled to the use of said waters." And this court is asked to confirm such riparian right. In his report the master says:

"The testimony shows that Sierra Pacific Power Company has title to 994.74 acres of riparian lands acquired by the State of California under the Act of Congress of September 28, 1850, known as the Swamp Land Act and has title to 1631.21

acres of riparian lands acquired by the State of California under the Act of Congress of March 3, 1853, known as the School Land Act, four hundred acres being school lands and 1231.21 acres being school lieu lands. The testimony further shows that approximately four hundred acres of these swamp lands and school and school lieu lands have been irrigated since sometime prior to 1901 from the waters of West Walker River and its tributaries, by the annual overflow of the streams flowing through said lands and by means of some nine or more diversion ditches and that wild grass and pasturage have been raised on said lands. It does not appear that any substantial improvements have been made upon said lands or any large sums of money expended in the construction of ditches or in the dams for diverting the water upon the lands."

From statements made at the oral argument by counsel for the Sierra Company, it appears that the company claims a right by appropriation to irrigate 350, acres of land. It is an alleged prescriptive right, which has not been determined as to priority or quantity, and mentioned above by the master as approximately 400 acres irrigated annually by the stream overflow.

What the Sierra Company particularly stresses is its claim to a right to impound water for power purposes in a reservoir to be constructed upon land in Pickle Meadows on the West Walker, asserting such right by virtue of riparian ownership under the laws of California. It is admitted that neither said company nor its predecessors have ever made any use, beneficial or otherwise, of said alleged riparian right.

With the exception of the defendant Sierra Company, all defendants, both in Nevada and in California, have stipulated that the law of appropriation shall govern in the determination of their claims to the waters of the Walker river and its tributaries. The predecessors of Sierra Company were parties in the case entitled Pacific Live Stock Co. v. T. B. Rickey et al., referred to herein as having been decided in decree 731. A large part of the lands of the Sierra Company were purchased from the successor of the defendant Rickey during the pendency of the present suit. Practically all of the remaining lands now owned by the Sierra Company and for which it claims a riparian right to store water for power purposes were acquired subsequent to the filing of the Pacific Live Stock Company suit. In

decree 731 all of the rights of the predecessors of Sierra Company were fixed by the law of appropriation. The other defendants who were parties to decree 731 and who are also parties in the instant suit object to the granting of a riparian right to Sierra Pacific Power Company.

Walker river and its tributaries, known as "flash" or seasonal streams, comprise a single system. The evidence shows that during the irrigation season of six months all of the water of the rivers, except flood water, has been fully appropriated, and is necessary for the irrigation of lands which have been brought under cultivation. It is to the interest of all concerned that the rights of all claimants to the beneficial use of water on the stream system be adjudicated. The rights to be adjusted are in California and Nevada, subject to different laws. California recognizes both appropriation and riparian rights. Its riparian doctrine, invoked by the Sierra Company, has been recently modified by a constitutional amendment, hereinafter quoted and discussed. The amendment having been passed under and by virtue of a reasonable exercise of the police power, constitutes a lawful abridgment of the riparian right. Tulare Irrigation District et al. v. Lindsay-Strathmore District, 45 P.(2d) 972, decided by the California Supreme Court May 3, 1935. Nevada, a desert-land state, necessarily clings to the arid region doctrine of appropriation. The defendants having appeared in this suit and submitted themselves to the jurisdiction, all of the rights of the parties are before the court.

An interesting question of law arises under the circumstances here disclosed. It has been suggested that this court has not jurisdiction to make a decree in rem affecting the land and water rights outside of the state of Nevada, citing Miller & Lux v. Rickey (C. C.) 127 F. 573, 575, 580 (an outgrowth of case No. 731, referred to above). The point is discussed in Vineyard Land & Stock Co. v. Twin Falls S. R. L. & W. Co. (C. C. A.) 245 F. 9, 26, where the court says:

"As to the main question, this court has determined, by the case of Rickey Land & Cattle Co. v. Miller & Lux, 152 F. 11, 81 C. C. A. 207, that a suit of the nature here maintained is essentially one to quiet title to real property, and that it is local and not transitory. The Rickey Land & Cattle Company, in that case, set up cer-

tain rights in California that it claimed to the waters of the stream, and we held that its cross-complaint setting up such rights could not operate to defeat complainant's cause, but only defensively, 'and not to give the defendant a right to have its title also quieted in the state of California.' Hawley, District Judge, in the same case, on the trial in the District Court, had this to say:

" 'It (the court) cannot, by any decree which it may make in this suit, directly reach the dams, reservoirs, or ditches belonging to the defendant located entirely within the state of California.' Miller & Lux v. Rickey (C. C.) 127 F. 573, 575.

"In this expression of the law we concur. But has the plaintiff no remedy where a defendant has been personally served and appears in the court, and is enjoined forever from doing certain things in another state to the detriment of plaintiff's rights? The authorities are clear that he has. Such a remedy was sustained in the Rickey Land & Cattle Co. Case, supra."

In Miller & Lux v. Rickey, supra, and in Rickey Land & Cattle Co. v. Miller & Lux, supra, the identical land and waters of the Walker River basin here involved were in controversy. The language used and the holding of the last-mentioned case are peculiarly apposite to the case at bar. The court in 152 F. 11, at pages 17, 18, says:

"The appellant's counsel maintain that, because the appellant has set up in its answer and cross-bill to the original suit that it has an appropriation in California for the purpose of irrigating lands in that state, therefore the court in Nevada has no jurisdiction to determine its rights in the state of California. The contention seems to us to be beside the question. The defendant will not be permitted, by thus setting up a cause of suit in the state of California, to defeat the jurisdiction of the court in the state of Nevada. The complainant must be permitted to proceed upon the case made by its pleadings, and the defendant cannot defeat the jurisdiction by alleging that it has rights elsewhere which may conflict with the rights of the complainant. It may be said that the court in Nevada has not the power to quiet the title of the defendant in the state of California. But the defendant has the right to set up its conflicting interests, which arose in California, as a defense against the attempt of the complainant to have its title in Nevada quieted, because the complainant's title must depend upon whether it has the better right as against the defendant—the rights of the parties arising in the states in which their respective interests are found. So that the answer and cross-complaint of the defendant can only operate defensively in the original suit, and not to give the defendant a right to have its title also quieted in the state of California. Though the Nevada court is not authorized or empowered to settle the rights of the parties in the state of California, it may look, nevertheless, under the defensive answer to the appropriation in the state of California, to ascertain and determine whether such appropriation is prior and paramount to the complainant's appropriation, and, if not, then to settle and quiet complainant's title and rights thereto.

"That our position may be fully understood, we will extend the discussion a little. The water in the stream, which has a propensity to seek its level, and will continue in its current to the sea, is in strict reality the veritable thing in controversy. It knows not imaginary state or county lines, and is a thing in which no man has a property until captured to be applied to a beneficial use. The right of appropriation is recognized in law, which means the right of diversion and use. It is the right, not to any specific water, but to some definite quantity of that which may at the time be running in the stream. So the right acquired by an appropriation includes the right to have the water flow in the stream to the point of diversion. The fact of a state line intersecting the stream does not, within itself, impinge upon the right. In other words, the appropriation may still be acquired although the stream is interstate and not local to one state; nor will the mere fact that the stream has its source in one state authorize a diversion of all the water thereof as against an earlier and prior appropriator across the line in another state. On the contrary, one who has acquired a right to the water of a stream by prior appropriation, in accordance with the laws of the state where made, is protected in such right as against subsequent appropriators, though the latter withdraw the water within the limits of a different state. Howell v. Johnson (C. C.) 89 F. 556; Hoge v. Eaton (C. C.) 135 F. 411; Anderson v. Bassman (C. C.) 140 F. 14. So that, in determining the right of appropriation in one state, it may become necessary to ascertain what are the rights in another, and a mere asser-

tion of rights in the courts of the latter state cannot operate to preclude the courts of the former from exercising cognizance over the entire subject-matter before them. The very question that appellant makes was determined in the case of Anderson v. Bassman, supra:

" 'It is objected by the defendants,' says Morrow, Circuit Judge, 'that the relief sought by the bill, in determining the rights of the complainants to a specific quantity of the waters of the West Fork of the Carson River, is beyond the jurisdiction of this court, in that it is asking the court to pass upon titles to real property in another state.'

"And the decision was against the contention. So the decision here must be against appellant's contention upon the point urged."

The above case went to the United States Supreme Court on certiorari (Rickey Land & Cattle Co. v. Miller & Lux, 218 U. S. 258, 31 S. Ct. 11, 13, 54 L. Ed. 1032) and was affirmed. Suits had been brought by respective parties in California and Nevada. Before the Supreme Court, the petitioner contended that there was no conflict of jurisdiction, and that the proceedings in the California court should go on. Justice Holmes, who delivered the opinion for the court, said in part:

"We are of opinion that the petitioner fails to establish the conclusion for which it contends. The alleged rights of Miller & Lux involve a relation between parcels of land that cannot be brought within the same jurisdiction. This relation depends as well upon the permission of the laws of Nevada as upon the compulsion of the laws of California. It is true that the acts necessary to enforce it must be done in California, and require the assent of that state so far as this court does not decide that they may be demanded as a consequence of whatever right, if any, it may attribute to Nevada. But, leaving the latter possibility on one side, if California recognizes private rights that cross the border line, the analogies are in favor of allowing them to be enforced within the jurisdiction of either party to the joint arrangement. Great Falls Mfg. Co. v. Worster, 23 N. H. 462. Full justice cannot be done and anomalous results avoided unless all the rights of the parties before the court in virtue of the jurisdiction previously acquired are taken in hand. To adjust the rights of the parties within the state re-

quires the adjustment of the rights of the others outside of it. Of course, the court sitting in Nevada would not attempt to apply the law of Nevada, so far as that may be different from the law of California, to burden land or water beyond the state line, but the necessity of considering the law of California is no insuperable difficulty in dealing with the case. Foreign law often has to be ascertained and acted upon, and one court ought to deal with the whole matter.

"We are of opinion, therefore, that there was concurrent jurisdiction in the two courts, and that the substantive issues in the Nevada and California suits were so far the same that the court first seised should proceed to the determination without interference, on the principles now well settled as between the courts of the United States and of the states. Prout v. Starr, 188 U. S. 537, 544, 23 S. Ct. 398, 47 L. Ed. 584, 587; Ex parte Young, 209 U. S. 123, 161, 162, 28 S. Ct. 441, 52 L. Ed. 714, 729, 730, 13 L. R. A. (N. S.) 932 [14 Ann. Cas. 764]."

This leads to a consideration of the law of California for the purpose of ascertaining whether or not the Sierra Company, by reason of the fact that it owns lands bordering on the West Walker river, has a riparian use to store water for power purposes. For many years the courts of California created the water law of the state without constitutional direction. What was known as the California riparian doctrine has been changed by adoption of section 3 of article 14 of the Constitution of California which became effective in November, 1928. In Tulare Irrigation District et al. v. Lindsay-Strathmore Irrigation District, supra, Chief Justice Waste of the California Supreme Court stated that the effect of the amendment has been to modify the long-standing riparian doctrine heretofore announced by the court in several leading cases, and to apply by constitutional mandate the doctrine of reasonable use between riparian owners and appropriators. The effect of the amendment is fully discussed by Justice Shenk, speaking for the state court, in the case of Peabody v. City of Vallejo (Cal. Sup.) 40 P.(2d) 486, 490. Quoting from the opinion:

"In adopting a policy modifying the long standing riparian doctrine of this state, California has done by constitutional amendment what many of the western states have done by statute or court deci-

sions. Of the seventeen western states which are generally referred to as the irrigation states, nine now recognize the modified doctrine of riparian rights and eight have entirely abrogated the doctrine of riparian rights and recognize only the doctrine of appropriation. The nine are North Dakota, South Dakota, Nebraska, Kansas, Oklahoma, Texas, Washington, Oregon, and California; and the eight are Montana, Idaho, Wyoming, Nevada, Utah, Colorado, Arizona, and New Mexico. Wiel on Water Rights, §§ 117, 118. Mr. Wiel at the time properly listed Montana as a riparian state, but in 1921 it was held in Mettler v. Ames Realty Co., 61 Mont. 152, 201 P. 702, that the doctrine of riparian rights was abrogated and that the doctrine of prior appropriation obtained exclusively in that state.

"In further clarifying the new state policy we have no hesitancy in doing so without fear of infringing upon any provision of the Federal Constitution. The attitude of the Supreme Court of the United States has been consistent in leaving the question of private water rights, which do not involve federal or interstate interests, to the control of local state policies. United States v. Rio Grande Dam & Irr. Co., 174 U. S. 690, 702, 703, 19 S. Ct. 770, 43 L. Ed. 1136. Hudson County Water Co. v. McCarter, 209 U. S. 349, 356, 28 S. Ct. 529, 52 L. Ed. 828, 14 Ann. Cas. 560; State of Connecticut v. Commonwealth of Massachusetts, 282 U. S. 660, 670, 51 S. Ct. 286, 75 L. Ed. 602.

"Section 3 of article 14 of the California Constitution, inserted as a new section by amendment in 1928, is as follows: 'It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water. Riparian rights in a stream or water course attach to, but to no more than so much of the flow thereof as may be required or used consistently with this section, for the purposes for which such lands are, or may be made adaptable, in view of such reasonable and beneficial uses; provided, however, that nothing herein contained shall be construed as depriving any riparian owner of the reasonable use of water of the stream to which his land is riparian under reasonable methods of diversion and use, or of depriving any appropriator of water to which he is lawfully entitled. This section shall be self-executing, and the Legislature may also enact laws in the furtherance of the policy in this section contained.'

"The rule of reasonableness of use as a measure of the water right has been applied by this court as between riparian owners (Pabst v. Finmand, 190 Cal. 124, 211 P. 11); as between owners overlying an underground water supply (Katz v. Walkinshaw, 141 Cal. 116, 70 P. 663, 74 P. 766, 64 L. R. A. 236, 99 Am. St. Rep. 35); as between appropriators (Natoma W. & M. Co. v. Hancock, 101 Cal. 42, 31 P. 112, 35 P. 334); as between overlying owners and exporters from an underground basin to nonoverlying lands (Burr v. Maclay Rancho Water Co., 154 Cal. 428, 98 P. 260); and as between riparian owners and overlying owners under the doctrine of common source of supply (Hudson v. Dailey, 156 Cal. 617, 105 P. 748); but the court has denied its application as between a riparian owner and an appropriator. The constitutional amendment, from its effective date, and as interpreted in the Gin S. Chow Case [217 Cal. 673, 22 P. (2d) 5], has enjoined the doctrine of reasonable use as between the riparian owner and an appropriator. The limitations and prohibitions of the constitutional amendment now apply to every water right and every method of diversion. Epitomized, the amendment declares:

"1. The right to the use of water is limited to such water as shall be reasonably required for the beneficial use to be served.

"2. Such right does not extend to the waste of water.

"3. Such right does not extend to unreasonable use or unreasonable method of use or unreasonable method of diversion of water.

"4. Riparian rights attach to, but to no more than so much of the flow as may be

required or used consistently with this section of the Constitution.

"The foregoing mandates are plain, they are positive, and admit of no exception. They apply to the use of all water, under whatever right the use may be enjoyed. The problem is to apply these rules in the varying circumstances of cases as they arise.

"The waters of our streams are not like land which is static, can be measured and divided, and the division remain the same. Water is constantly shifting, and the supply changes to some extent every day. A stream supply may be divided but the product of the division in no wise remains the same. When the supply is limited public interest requires that there be the greatest number of beneficial uses which the supply can yield."

It is settled law in California that the storage of water for power purposes is not a legitimate riparian use. It was so held in Colorado Power Co. v. Pacific Gas & Electric Co., 218 Cal. 559, 564, 24 P.(2d) 495, 497: "This point has been so recently before this court," quoting from the opinion, "and so fully and completely disposed of adversely to defendant's contention that no necessity exists for a lengthy discussion here. Seasonal storage of water for power purposes is not a proper riparian use, but constitutes an appropriation, so that, if continued for time prescribed by the statute of limitations, it will ripen into a prescriptive right." Citing Herminghaus v. Southern California Edison Co., 200 Cal. 81, 252 P. 607 and Seneca Consol. Gold Mines Co. v. Great Western P. Co., 209 Cal. 206, 287 P. 93, 70 A. L. R. 210. "In the Herminghaus Case, the action was by a lower riparian against an upper riparian owner who proposed to store seasonally and artificially the flow of the waters of the stream. The upper riparian owner contended that this was a proper riparian use. The point presented for decision was whether or not seasonal storage was a proper riparian use, and this court squarely held that it was not." 218 Cal. 559, page 565, 24 P.(2d) 495, 498.

It was also held in Peabody v. City of Vallejo, supra, that the right to waste of water is not now included in the riparian right, and when needed for beneficial uses it may be stored or restrained by appropriation, subject to the rights of those who have a lawful priority in a reasonable beneficial use; and that the riparian has no right to have the flood and freshet waters leave the natural channel of the stream, overflow his lands and never return to the channel.

It follows from what has been said that the Sierra Company has not a riparian use for the impounding or storage of water for power purposes, and its prayer for judgment and decree confirming such rights must be denied. Doubtless appreciating the difficulties of the situation counsel for the Sierra Company, in oral argument, stated that he recognized that the proposed diversion and storage "must be a reasonable one which must not interfere with the use of a lower appropriator." But we are not here concerned with what has been described as "the use of the hydraulic effect of the stream for the generation of electric current," which has been held to be a legitimate exercise of the riparian right. Mentone Irr. Co. v. Redlands Electric Light & Power Co., 155 Cal. 323, 100 P. 1082, 22 L. R. A. (N. S.) 382, 17 Ann. Cas. 1222; Seneca Consol. Gold Mines Co. v. Great Western Power Co., 209 Cal. 206, 215, 287 P. 93, 70 A. L. R. 210. The Sierra Company is demanding confirmation of its claimed rights as a riparian owner to divert and impound water for power purposes, which is inhibited by law. All of the water in the rivers having been heretofore appropriated and put to beneficial uses, whatever rights to the waters of the West Walker, whether as riparian or appropriator, said company may now have or hereafter assert, it is clear that such rights are subject and subordinate to the prior rights of the lower appropriators, who are entitled to protection against interference, obstruction, and diminution of the natural seasonal stream flow.

Mention has been made herein of 350 or 400 acres of land, owned by the Sierra Company, which it is said has been irrigated since 1901, and of which there has been no determination as to priority or quantity. The case will be referred to the master to take evidence and hear counsel for the purpose of determining what rights, their quantity and priority, if any, said company has in the premises. Said company may have thirty days from date hereof, if so advised, in which to offer the necessary proofs. At the conclusion of the hearing the master is directed to prepare and submit to this court forms of findings of fact and conclusions of law and decree giving effect to this decision. Counsel for

respective parties shall have ten days after notice to them by the master of the filing of his report and said forms with the clerk, in which to submit their objections.

Except as indicated by the views herein expressed, the exceptions to the master's proposed findings and conclusions of law and decree, heretofore submitted, will be overruled.