## UNITED STATES v. GARAVENTA LAND & LIVESTOCK CO. et al.

### No. 2741.

District Court, D. Nevada.

March 8, 1941.

Miles N. Pike, U. S. Atty., and Thomas O. Craven, Asst. U. S. Atty., both of Reno, Nev., for plaintiff.

W. M. Kearney and Douglas A. Busey, both of Reno, Nev., for defendants.

NORCROSS, District Judge.

This is an action to recover possession of certain lands, containing 236.14 acres, within the exterior boundaries of the Pyramid Lake Indian Reservation. Basis of recovery is alleged failure to comply with the provisions of the Act of Congress of June 7, 1924, entitled "An Act For the relief of settlers and town-site occupants of certain lands in the Pyramid Lake Indian Reservation, Nevada," 43 U.S.Stats. 596, 25 U.S.C.A. § 421 note, and regulations promulgated thereunder. Section 1 of said Act provides: "That the Secretary of the Interior is hereby authorized to sell to settlers or their transferees, under such terms, conditions, and price per acre as the said Secretary may prescribe, any lands * * * that have been settled upon, occupied, and improved by said settlers and their transferees in good faith for a period of twenty-one years or more immediately preceding the passage of this Act: * * * Provided further, That said sales shall be by private cash entry after it has been shown * * * that the lands applied for have been settled upon, occupied, and improved as required by this Act * * *. The proceeds of said sales shall be * * * for the Piute Indians of the said Pyramid Lake Indian Reservation."

Section 2 of said Act deals with sales of lands in the town of Wadsworth within said Reservation.

Section 3 provides: "That titles to lands * * * acquired by patents heretofore issued by the United States to any railroad company, individual, or the State of Nevada, or by certification to the State of Nevada, are hereby confirmed."

Section 4 provides: "All sales in accordance with section 1 of this Act shall be made through the local land office within ninety days after the price of the land shall have been fixed by the Secretary of the Interior: Provided, That where entry is not made within the time specified, the United States shall enter upon the premises and take possession thereof for the use and benefit of the Piute Indians of the Pyramid Lake Indian Reservation."

The complaint alleges that on or about May 7, 1925, pursuant to said Act and the Regulations promulgated thereunder, the defendant, Garaventa Land & Livestock Company, made application to the Department of Interior to enter upon and to purchase the lands in question, and, pursuant to said Act and Regulations, such application was allowed, and said defendant did enter upon said lands and was required to and did agree to pay plaintiff therefor, as purchase price thereof, the total sum of $4,005.70, plus interest at 4% per annum on all unpaid principal, such interest to be paid on or before April 10, 1936. That said defendant has failed, refused and neglected to pay said purchase price or interest, except the sum of $1,853.92, which sum was paid on or about June, 1925, and defendant has paid no further sum on said purchase price since said date. That on or about May 13, 1936, the entry of said defendant upon said lands, and its right to purchase the same, was cancelled by the Department of the Interior, pursuant to the terms of said Act and said Regulations, and on March 10, 1936, said defendant was served with written notice of such cancellation.

The answer filed by defendant corporation denies refusal and/or neglect to pay said purchase price or the interest thereon, except said sum of $1,853.92, and alleges that ever since the year 1865 the defendant, by itself, and through its predecessors and grantors in interest has been in possession and actual occupation of the lands described, improved the same and diverted water from the Truckee River by means of dams and ditches for irrigation purposes and constructed improvements thereon consisting of houses, barns, stables, corrals and enclosed the same with fence. That at the time of original entry upon said land by the grantors and predecessors of defendant, the boundaries of said Reservation had never been surveyed and were not so surveyed or marked until the year 1874. That after making said contract of purchase, pursuant to said Act of 1924, defendant was granted an extension of time within which to complete the payment of the purchase price and interest. That during the financial depression, commencing about the year 1930, defendant found itself heavily in debt and impossible to obtain funds with which to pay the balance of

said purchase price. That further extensions of time were obtained to raise the money to complete said purchase price. That defendant carried on negotiations to raise said purchase price and when defendant obtained said funds and made an offer to pay the same, said funds were refused on the basis that the said contract had been cancelled. That defendant has offered to pay to plaintiff the said amount of purchase money together with interest and has tendered the same to the Register and Receiver of the United States Land Office at Carson City, Nevada, but said officers refused to accept said payment and still and now refuse to accept the same; that the defendant has at all times kept the said tender and payment good and still and now offers to pay the said purchase money, with interest, in full.

Defendant prays judgment that plaintiff take nothing by its complaint; that defendant be awarded judgment requiring plaintiff to accept the said purchase moneys theretofore and now tendered and that patent be directed to be issued to defendant for said lands and for such other and further relief as to the Court seems just and equitable.

This and other similar actions, consolidated for hearing, presents the question of the legal rights of the respective parties to certain lands within the exterior boundaries of the Pyramid Lake Indian Reservation.

The lands in question, in the main, have been continuously occupied and improved by defendants and their grantors and predecessors in interest for the past seventy or more years, the earliest occupation of settlers thereon being about the year 1863, and a number were made in 1865 and 1866. Water rights on lands involved in two of the cases are of dates 1880 and 1890. The Reservation was officially established by proclamation of President Grant, March 23, 1874. In 1859, the Indian Superintendent located at Salt Lake City, Utah, recommended to the Superintendent of Indian Affairs at Washington, D. C., that Pyramid Lake and Walker Lake, with adjacent lands surrounding, in then Western Utah Territory, be set apart and reserved as and for Reservations for Indians residing in the vicinity thereof. This recommendation was approved and the Secretary of the Interior and the Commissioner of the General Land Office advised accordingly. No further official action appears to have been taken respecting said Reservations until the President's Proclamation in 1874. In the case of United States v. Walker River Irrigation District, 104 F.2d 334, 338, the Circuit Court of Appeals of this Circuit held that the executive order of President Grant of 1874 related back to 1859, and is controlling in this case. See also decision of this Court in the same case to the same effect, 11 F.Supp. 158, 162.

It is a matter of well known history that following the settlement of white colonists on the American continent prior to the Revolution and subsequent thereto for more than a century, differences arose between the Indian inhabitants and the white settlers respecting their claimed respective rights to the occupied domain. Instances where actual warfare followed are numerous. The section of the Nation acquired by the Treaty of Guadalupe Hidalgo, concluding the Mexican War, was subject to the same conditions. The discovery of gold in California in 1848 attracted emigrants in large numbers to that section. From the Indian's point of view, the white emigration interfered with their prior rights of possession, particularly rights to maintain a livelihood from hunting, fishing and other natural products.

President Grant, who issued the Executive Orders of May 24, 1874, affirming the establishment of the Pyramid Lake and Walker Lake Indian Reservations, had served as commanding officer at a fort established at Humboldt Bay, California, in the early 50's, to deal with the Indian situation in that section and, hence, was familiar with the situation in the far West generally including that of the then Territory of Utah. In his message to Congress of December 7, 1874, he said, "The policy adopted for the management of Indian affairs, known as the peace policy, has been adhered to with most beneficial results. It is confidently hoped that a few years more will relieve our frontiers from danger of Indian depredations."

The Indian situation in the Territory of Utah in 1859, and thereafter in the Territory and State of Nevada, is quite fully covered in the opinion of Judge St. Sure, 11 F.Supp. 162, cited supra. Reference here will be made only to the fact that by reason of occurrences in 1859, two engagements occurred in 1860, within what later was determined to be within the confines of the Reservation known respectively as the First and Second Battle of Pyramid Lake.

In the First the Indians were victorious and in the Second they were defeated. In 1863, three several calls were made on the Governor of the Territory of Nevada. to raise troops to aid in keeping open the overland stage and emigrant route to California, threatened with closure by warring Indians.

By Acts of Congress of 1862 and 1864, provision was made for the extension of a railroad system to the Pacific Coast, in aid of which, land grants were made for a two hundred feet right of way and odd numbered sections of the public domain for a width of twenty miles on each side of the right of way. The Central Pacific Railroad was completed in 1869, and crossed the southern portion of the Pyramid Lake Indian Reservation. A railroad division point was established at Wadsworth within the exterior boundaries of said Reservation. The State of Nevada was admitted in 1864, 13 Stat. 30, and its Enabling Act, Section 7, provided a grant of the 16th and 36th sections of each township. Lands within the Reservation so granted to the State and Central Pacific Railroad have been recognized as not affected by any prior withdrawal in respect to the said Reservation.

At the time of the admission of the State of Nevada into the Union of States, October 31, 1864, there had been no surveys of public lands within its confines. Such surveys were not begun until about the year 1866. The discovery of the Comstock Lode in 1859 was the occasion of a rapid increase of population in the adjacent territory. This occasioned a demand for agricultural products which the region was able to produce. The State being within the arid region, irrigation was necessary for substantial development of lands available for such reclamation. White settlers entered upon such lands in Western Nevada and diverted waters from the Truckee, Carson and Walker Rivers for the irrigation thereof. The Federal land laws then recognized such original locators to have a prior right to acquire patent to such lands when surveyed and open to entry in a Federal Land Office. The lands here in question were so settled upon and improved. Where, without the knowledge of the settler, the land had theretofore been withdrawn from entry, it was the common practice to permit the settler, notwithstanding such withdrawal, to obtain title or to aid him in acquiring other lands in substitution. The settler, however, possessed no enforceable rights therein adverse to the Government.

The Federal Reclamation Act of June 17, 1902, as revised and amended in 1924, 43 Stat. 701, 43 U.S.C.A. § 371 et seq., made provision for Federal aid in the reclamation of arid lands. The first Project established under this law, July 2, 1902, is known as the Truckee-Carson or Newlands Project. Following its establishment, two suits were instituted in this Court by the United States as plaintiff to determine prior existing water rights on both the Truckee and Carson Rivers. The Project was located near Fallon approximately thirty miles from the southerly end of Pyramid Lake Indian Reservation. In what is known as the Truckee River Suit, a temporary restraining order was entered February 13, 1926, making a preliminary determination of the then existing water appropriations theretofore made upon said River, designated Claim No. 1, etc., to No. 744. Claims Nos. 1 to 4, inclusive, relate to rights of the United States under the general designation "Government Rights." Claim No. 1, sub-headed: "Indian Ditch," deals with water rights "for the use and benefit of the Indians" on said Reservation to the extent of 3130 acres. Claim No. 2, sub-headed "Indian Allotments," deals with water rights for such allotments when made. Claims Nos. 3 and 4 deal with the construction of a dam and canal and storage in Lake Tahoe for the Project in general. The said restraining order deals with the defendant herein and defendants in other similar suits in the same manner as other land owners and water claimants without the limits of the Reservation.

It has been urged upon the part of the defendants in the several actions that plaintiff is not entitled to recover because the equities are in favor of the several defendants. The Court's attention has been called to a memorandum addressed to the Secretary of the Interior by the Commissioner of Indian Affairs of date December 19, 1929, and appearing in the printed report of hearings before the Committee on Indian Affairs, United States Senate in the year 1937, on Senate Bill 840, a portion of which reads: "The white settlers have only such legal rights as were extended to them by the Act of June 7, 1924, but their equities are unquestioned, and in view of all the facts and circumstances of this case, not one of them may be charged with

bad faith, and this without regard to whether the reservation be considered as established by the Commissioner's letter of 1859, the departmental withdrawal of 1861, or the Executive Order of the President in 1874. The Indians were not in possession when the white settlements were made, the boundary lines of the reservation were not clearly established, the Government offered no opposition to the settlers, and their claims were bought and sold much in the manner of privately owned lands. The new purchasers took possession, and no objection appears to have been raised by the Government."

It is the conclusion of the Court that it is unnecessary to consider the question of the equities of the case otherwise than on any possible bearing which they may have on the construction of the statute in question. The statute, by section 1, confers power in the Secretary of the Interior "to sell to settlers or their transferees, under such terms, conditions, and price per acre as the said Secretary may prescribe * * *: Provided further, That said sales shall be by private cash entry * * *." By section 4, it is provided that "all sales * * * shall be made through the local land office within ninety days after the price of the land shall have been fixed by the Secretary of the Interior: Provided, That where entry is not made within the time specified, the United States shall enter upon the premises and take possession thereof * * *."

■ The use of the words "terms" and "conditions" clearly show that in order to effect an entry upon the occupied lands where, as in this case, the total price therefor is not required to be paid in full at one time but a part cash payment only is required and time or times allowed for subsequent cash payments with interest to accrue thereon, a prescribed cash payment on account of the total purchase price, made within the ninety days period, effects an entry within the clear meaning of the statute. We here have a special statute to consider dealing with an unusual situation respecting the public lands. The statute requires that sales shall be made through the local land office within ninety days after the price of the land shall have been fixed and that where entry is not made within the time specified, the United States shall enter upon the premises and take possession thereof. Where, as in this case,

under the terms and conditions of the sale, an initial part payment only was required, then, unless that part payment be deemed to constitute the "entry" required to be made within ninety days, then a legal entry, under the terms and conditions as prescribed by the Secretary of the Interior, would not be effected although subsequent payments were made within the times specified. In the view of the Court, the statute was correctly construed by the Secretary of the Interior in this respect and that the partial payment made constituted entry within the meaning of the statute. Another consideration supporting this view is that the statute placed no limitations on the sale price to be fixed by the Secretary and the price as fixed was in excess of those required in ordinary sales of land within the public domain. The initial payment was in excess of such amount.

■ We come now to the question whether a subsequent default or defaults in deferred payments would present a condition which would require the United States to "enter upon the premises and take possession thereof." This requirement, however, only exists "where entry is not made within the time specified." Such default or defaults would not require such drastic remedy to fully protect the interests of the United States in the sale agreement. We are here dealing with a special statute authorizing land sales "under such terms, conditions, and price * * * as the said Secretary may prescribe." If, as in this case, an agreement of sale is entered into and part payment made, default in other payments may be enforced and, if not otherwise paid with interest and costs, all interest or equities in the land in question would be liable therefor, and, if payments not made, all equities of the settler could be terminated. Delay in payments, according to the answer, was due to financial difficulties occasioned in whole or in part by the depression. As soon as money could be raised it was tendered. It is not the policy of the Government to enforce strictly the provisions of the land laws against settlers on the public domain where circumstances, like those occasioned during a period of depression, may make it difficult for such settlers to comply. See statutes dealing with such conditions during the years 1929 to 1936, inclusive, in so far as homestead settlers or entrymen were concerned. 43 U.S.C.A. §§ 237a to 237e.

It is the conclusion of the Court that plaintiff is not entitled to the judgment prayed for in the complaint or any judgment in this action; that defendant is entitled to judgment to the effect that its tender be accepted and that it is entitled to receive patent for said land. It is, therefore, ordered that judgment be entered accordingly.